**2021 IL 125969**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125969)

*In re* Br. M. and Bo. M., Minors (The People of the State of Illinois, Appellant,
v. Wendy M., Appellee).

*Opinion filed April 15, 2021.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Justices Garman, Michael J. Burke, Overstreet, and Carter concurred in the judgment and opinion.

Chief Justice Anne M. Burke dissented, with opinion, joined by Justice Neville.

**OPINION**

¶ 1       The sole issue in this case is whether the appellate court erred in reversing the trial court's decision to terminate respondent Wendy M.'s parental rights on the grounds that her privately retained attorney at several hearings on a neglect petition had a *per se* conflict of interest because the attorney was previously appointed as

guardian *ad litem* for one of Wendy's children and appeared at three hearings on an earlier neglect petition. For the reasons that follow, we reverse the judgment of the appellate court.

¶ 2                                    BACKGROUND

¶ 3        In 2011, Wendy was charged with felony theft and subsequently placed on probation. In 2012, Wendy tested positive for cocaine and phencyclidine (PCP). Her probation was revoked, and she was sentenced to two years' imprisonment. Prior to entering custody, Wendy arranged for her boyfriend, Jermaine Mirenda, to care for her six-year-old daughter, Br. M. According to a Department of Children and Family Services (DCFS) integrated assessment, Br. "came to the attention of DCFS on 7/31/13 due to concerns regarding the appropriateness of [Br.] remaining in Mr. Mirenda's care while [Wendy] was incarcerated." Those concerns related to pending allegations that Mirenda sexually abused a previous partner's seven- and eight-year-old daughters.[1] On August 9, 2013, the State filed a petition alleging that Br. was neglected.

¶ 4        On August 16, 2013, the trial court conducted a shelter care hearing. Wendy and Assistant State's Attorney Tina Filipiak were present. Assistant Public Defender Gail Bembnister was appointed as counsel for Wendy, and Assistant Public Defender Lea Drell was appointed as guardian *ad litem* (GAL) for Br. Filipiak informed the court that Wendy would stipulate to the State's allegations because she "is currently in custody and has a substance abuse problem that requires treatment." The trial court found probable cause that Br. was neglected due to an injurious environment. The court further found that shelter care was in the child's best interests, and it placed her in the temporary custody of DCFS. The court asked if Wendy understood that she would need to comply with a service plan from DCFS and correct the conditions that led to the neglect finding or risk termination of her parental rights. Wendy said yes.

¶ 5        On December 17, 2013, the trial court held an adjudicatory hearing. Wendy, Bembnister, Drell, and Assistant State's Attorney Misty Cavanaugh were present. The trial court again found Br. neglected due to an injurious environment. The

_____

[1]Mirenda was later indicated for sexual molestation of Br.

factual basis for that finding was Wendy's incarceration and substance abuse problem. Guardianship remained with DCFS. The court asked Wendy if she had been able to access services in prison. Wendy stated that she had attended parenting classes, as well as Alcoholics Anonymous and Narcotics Anonymous meetings. According to Bembnister, Wendy could not obtain individual counseling because she would not be incarcerated long enough. The court again asked if Wendy understood that her parental rights could be terminated if she did not comply with the service plan. Wendy said yes.

¶ 6      On January 17, 2014, the trial court held a dispositional hearing. Wendy, Bembnister, Br., Drell, and Cavanaugh were present. The State presented no witnesses and offered a DCFS integrated assessment, a DCFS service plan, and a DCFS dispositional report as evidence. The State asked the trial court to find Wendy unfit and unable to care for Br. The court asked Drell for her position as GAL, and she said:

> "[W]e would join in the argument of the State. The mother is going to be incarcerated until 2015.
>
> We need to have a stable place for [Br.] until her mother gets out and can engage in services. So we agree that DCFS custody and guardianship is the best situation right now."

Bembnister insisted that Wendy was not unfit but rather only "unable" to care for Br. The trial court found Wendy unfit, made Br. a ward of the court, and placed her in DCFS custody. The court noted that Wendy's release date would be in May 2014 and asked again if she understood that her parental rights could be terminated if she did not comply with the service plan. Wendy said yes.

¶ 7      After Wendy was released from prison, Bembnister filed a motion to restore fitness. On August 22, 2014, the trial court held a hearing on that motion. Wendy, Bembnister, and Cavanaugh were present. Bembnister informed the court that Drell was still acting as GAL. Bembnister stated that she had spoken to Drell about the motion and that "she has no objection and she did specifically cite the bond between the mother and the child." The trial court granted the motion, terminated DCFS's custody and guardianship, and vacated Br.'s wardship. The court's order instructed, "close file."

¶ 8 A month later, the State filed a supplemental petition, alleging that Br. was neglected. On September 9, 2014, the trial court held an initial hearing on that petition. Wendy, Br., Bembnister, and Cavanaugh were present. Cavanaugh asked the trial court to name a court appointed special advocate (CASA) as GAL for the child. Cavanaugh also asked the court to let "PC lapse" and return Br. to Wendy. Apparently, the supplemental petition was based on a hotline call, and Cavanaugh had developed some doubts about the veracity of the caller's information because of "animosity between the parties." Cavanaugh still wanted the CASA's "eyes and ears on this," and the court set another hearing. On October 15, 2014, the parties returned to court, and the State made a motion to withdraw the supplemental petition. The trial court granted that motion. The court's order instructed, "close file."

¶ 9 Two years later, on September 26, 2016, the State filed a second supplemental petition, again alleging that Br. was neglected. The State filed a companion petition, alleging that Br.'s half-brother, Bo. M., was also neglected. That day, the trial court held a shelter care hearing. Wendy and Assistant State's Attorney Walter Ratajczyk were present. Assistant Public Defender Lea Norbut was appointed to represent Wendy, and a CASA was appointed as GAL for both children. At the hearing, DCFS investigator Monique Boozer testified about two incidents. On August 16, 2016, police officers were called to Wendy's house around midnight because one of her children was screaming. When the officers arrived at the house, Wendy, her boyfriend, and Br. were outside. According to Boozer, Wendy was "so intoxicated that the police felt she was not able *** to care for the children," and the officers arranged for a relative to care for them. Wendy took a drug test later that day, and she was "positive for PCP."

¶ 10 On September 22, 2016, DCFS received a hotline call with concerns about Wendy's behavior when she picked up Bo. from school. The next day, when Wendy tried to pick up Bo. from school, her condition was reportedly "worse than she was the day before," and school officials refused to let him go with her and called the police. Police officers drove Wendy and Bo. to her house. Later, Boozer went to the house to speak to Wendy, but she was not there. After several hours, Wendy eventually arrived with Br. Wendy "appeared to be out of it" and was "not responsive." Boozer told Wendy that DCFS would find someone to watch the children overnight and would help her locate an inpatient substance abuse program

the next day. Boozer attempted to avoid taking protective custody of the children, but Br.'s paternal grandmother was unwilling to care for them, citing mistrust issues, and no other relative was available. Boozer called her supervisor and asked for help from the police. Police officers and Boozer told Wendy to get the children prepared to spend the night elsewhere, but she was unable to do so, so Br. did. The children then went to a neighbor's house, but DCFS received a hotline call requesting their removal because Br. was hysterical and could not be calmed. A caseworker placed the children with another family.

¶ 11　　At the conclusion of the hearing, the trial court found probable cause of an injurious environment for both children. The court also found an immediate and urgent necessity to place the children in temporary custody with DCFS. The court ordered DCFS to facilitate visitation between Wendy and the children and ordered Wendy to obtain a drug and alcohol evaluation. She indicated that she understood the court's order.

¶ 12　　That month, Wendy was incarcerated in the Will County Adult Detention Facility for driving under the influence. She was released in February 2017.

¶ 13　　On December 20, 2016, the trial court held an adjudicatory hearing. Wendy, Bo.'s putative father Gregory W., Boozer, a CASA as GAL for the children, and Ratajczyk were present. Wendy was represented by Assistant Public Defender Collette Safford, and Gregory was represented by Norbut standing in for her colleague Patricia Adair. The trial court admonished Wendy and Gregory, then accepted their stipulations to the allegations in the State's second supplemental petition. The court found that the children were neglected due to an injurious environment. The court asked Wendy and Gregory if they understood that they must comply with their DCFS service plans or risk termination of their parental rights. They both said yes.

¶ 14　　On May 18, 2017, the trial court held a dispositional hearing. Wendy, Safford, a CASA as GAL for the children, and Filipiak were present. Gregory was also present and represented by Assistant Public Defender Bartholomew Markese on Adair's behalf. The State offered four exhibits as evidence: a five-page dispositional report prepared by a DCFS representative, a 34-page service plan for both parents prepared by a DCFS representative, and two reports from Stepping

Stones, Wendy's inpatient treatment center. Wendy and Gregory did not offer any further evidence.

¶ 15    The court found Wendy unfit because of her substance abuse problem. According to the court, "she has completed residential [treatment, but] she has failed to fully commit to an after-care plan and there are indications that she is continuing to use." The court found Gregory unfit because he was incarcerated. The court made the children wards of the court and awarded custody and guardianship to DCFS. The permanency goal remained a return home for both children. The trial court asked the parents if they understood that their parental rights could be terminated if they failed to comply with their DCFS service plans. They said yes.

¶ 16    On November 15, 2017, the trial court directed the State to review both cases for grounds to terminate the parental rights of Wendy and Gregory. On December 14, 2017, the State filed termination petitions regarding both children. The petitions alleged that Wendy and Gregory were unfit in that they failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare; (2) protect the children from conditions within their environment injurious to the children's welfare; (3) make reasonable efforts to correct the conditions that were the basis for the removal of the children; and (4) make reasonable progress toward the return of the children within nine months after the adjudication of neglect (from December 20, 2016, to September 20, 2017).

¶ 17    At a March 21, 2018, status hearing, Wendy appeared with a new, privately retained attorney, Drell. Drell asked for a continuance to give Wendy "a chance to work on her services." According to Drell,

> "She is doing really well and is very, very serious about rehabilitation and getting her children back. It's very important to her and she is working very hard towards it, and I am here to see that she does that. We would like to have some time to get this all together."

Drell added that Wendy is "willing to take her children back and desperately wants them back and is doing everything she can to do that." The trial court agreed to a continuance. The fact that Drell appeared as Br.'s GAL at three hearings on the 2013 neglect petition before the same trial judge was not mentioned.

¶ 18    On July 30, 2018, the parties returned to court. Drell asked the trial court to continue the trial date to give Wendy "a chance to get her act together." Drell stated that she spoke to Wendy over a week earlier and that she had been evaluated by Stepping Stones. Drell also stated that Wendy "is now in a halfway house where she is getting substance abuse and parenting classes and doing everything that she is supposed to do." The trial court refused to grant a continuance.

¶ 19    On October 16, 2018, the trial court began a series of hearings on the State's termination petitions. Wendy, Drell, Gregory, Norbut, a CASA as GAL for the children, DCFS case manager Josephina Reyes-Garcia, and Ratajczyk were present. Reyes-Garcia testified that Bo. was 3 years old and Br. was 11 years old. Both had been in protective custody for two years. The State asked Reyes-Garcia if Br. had been in foster care before; Drell objected, and the State withdrew the question. Reyes-Garcia had been the case manager for Br. and Bo. since March 2017. At that time, Wendy's integrated assessment showed that she suffered from substance abuse problems, and it recommended individual therapy and parenting classes. DCFS referred her to Stepping Stones. The center initially recommended outpatient treatment, but Wendy tested positive for drugs, so she entered an intensive residential treatment program in April 2017. At the end of that program, Stepping Stones recommended a 90-day extended residential treatment program. According to Reyes-Garcia, Wendy refused. She also refused a three-day-per-week intensive outpatient treatment program. Instead, she agreed to an outpatient recovery program that required one Stepping Stones meeting and one Alcoholics Anonymous meeting per week. Wendy did not attend any meetings for three weeks, and then she relapsed and tested positive for PCP in June 2017.

¶ 20    Reyes-Garcia testified that she referred Wendy to Stepping Stones again for another assessment. Before that assessment, Wendy relapsed again and came to a supervised visit with Br. intoxicated. That visit was terminated immediately. Wendy spoke to Reyes-Garcia, blamed DCFS for taking her children, and denied being intoxicated. Ultimately, Wendy did the assessment at Stepping Stones, and the center recommended a 30-day residential treatment program. Wendy accepted that recommendation but discharged herself after 10 days. She refused to go back because she did not like the center, asserting that its staffers were "against her" and "lying about her." Reyes-Garcia encouraged Wendy to seek treatment at another center called Brandon House, but Wendy chose to seek treatment at Women's

Treatment Center in Chicago. She stayed 27 days of a 30-day inpatient program there, and the center recommended another intensive outpatient program. Wendy declined, telling Reyes-Garcia that "she felt she completed her treatment." Reyes-Garcia referred Wendy for two drug tests—one in November 2017 and one in December 2017. She did not attend the November test, but she attended the December one, and her result was "clean." Reyes-Garcia then referred Wendy for four drug tests in February 2018. She attended none of them. Reyes-Garcia then requested that Wendy do a new substance abuse assessment at Stepping Stones. She refused.

¶ 21    Reyes-Garcia testified that Wendy was arrested for theft on April 11, 2018, and released on June 1. Wendy did an assessment at Stepping Stones in July 2018, and the center recommended outpatient treatment. Reyes-Garcia did not know whether Wendy completed that program. Reyes-Garcia testified about other aspects of Wendy's service plan, including parenting classes and individual therapy. She did not complete the former, and the latter was terminated for poor attendance.

¶ 22    Drell then cross-examined Reyes-Garcia. Drell focused on Wendy's initial integrated assessment, which another DCFS caseworker had completed prior to Reyes-Garcia's involvement in the case. Drell noted that Wendy was incarcerated from September 2016 until February 2017 in the Will County jail, which was a sizeable portion of the nine-month period in which she could show reasonable progress regarding the service plan. Reyes-Garcia said that some services were available in the jail. Drell asked Reyes-Garcia whether Wendy took advantage of those services. Reyes-Garcia acknowledged that Wendy received a certificate for active participation in the jail's drug recovery program and completed a total of 12 classes. Reyes-Garcia also acknowledged that she never gave Wendy credit for those classes, though she did give her credit for attending therapy sessions. According to Reyes-Garcia, Wendy's therapist said that she was making progress during the year that he saw her. The therapy required by the service plan, however, was not completed because Wendy stopped attending sessions due to an illness. Regarding parenting classes, Wendy participated in them at the center in Chicago but did not complete the entire parenting program. And she took parenting classes at the jail.

¶ 23    Reyes-Garcia stated that Wendy and Br. had a strong relationship "to an extent." On redirect examination by the State, Reyes-Garcia explained:

> "The relationship with [Wendy] and [Br.] is complicated based on the child where she has mixed emotions, where is most of the time worried, concerned about her mom's whereabouts and safety and her well-being, causing her some stress, anxiety."

Reyes-Garcia expressed some "concerns" about Bo.'s relationship with Wendy. After visits with her, he would exhibit negative behaviors—tantrums, hitting, and biting.

¶ 24    Kaitlin Nolan, an advocate supervisor with the CASA, testified about her concerns with Wendy as a parent. Nolan stated that, since September 2016,

> "Wendy seemed to have a drug addiction that continues to this day. She has been in and out of multiple rehab facilities, detox facilities. She's visited multiple emergency rooms for PCP overdoses.
>
> She's had the Joliet Fire Department called due to being unresponsive due to a drug overdose. She consistently says that she does not have a drug problem. She's transient as to where she is living. She has multiple cases of domestic violence all the way up until the last month ***."

Nolan described three overdoses—one on April 7, 2017, another during the first week of May 2017, and another on June 6 or 7, 2017. On cross-examination by Drell, Nolan conceded that Wendy was "working at" addressing her substance abuse problem, but she did not complete treatment.

¶ 25    After Nolan's testimony, Drell made an oral motion for a directed verdict, arguing that the State had not proved that Wendy did not comply with her service plan. The State responded that it had demonstrated by clear and convincing evidence that Wendy did not make reasonable progress toward the return of her children during the nine-month period from December 20, 2016, to September 20, 2017. Drell replied that Wendy was incarcerated for part of that period and still pursued services while in jail. The trial court denied the motion.

¶ 26        On November 20, 2018, the hearing continued. Tara Alexander from Help at Home, an organization that supervises visits for DCFS, testified that she was present for more than 10 visits between Wendy and her children. Drell asked Alexander about those visits. According to Alexander, Wendy brought them clothes and toys, and the three would play and interact together for two hours. Alexander noticed a strong bond between Wendy and the children, and the children did not want to leave at the end of those visits. Alexander repeated, "you could tell that they had a strong bond together."

¶ 27        Drell then called Wendy as a witness. Wendy stated that, while she was incarcerated for five months in late 2016 and early 2017, she took substance abuse and parenting classes in jail. Wendy then did an inpatient program at Stepping Stones when she was released. When the program was over, Wendy visited a therapist for a year on the recommendation of Reyes-Garcia. Wendy discussed the program at the Chicago center. There, she attended meetings and "learned a lot." She also went to Alcoholics Anonymous meetings at a nearby church. According to Wendy, she found a sponsor and still attends meetings. She affirmed that she has maintained her sobriety for more than a year.

¶ 28        Drell asked Wendy if she had satisfied all the requirements of her service plan when she left the Chicago center, and Wendy said yes. Her visits with her children were shortened to one hour per month when the State filed its termination petitions. When that happened and Reyes-Garcia recommended that Wendy return to substance abuse treatment, she checked herself into Tabitha House from July 17, 2018, until October 9, 2018. Wendy called that facility "a recovery home for when you're sober and trying to live a sober life and you go to meetings." She had to do random drug tests while there. All were negative. Wendy testified that she moved out of Tabitha House after she found a home of her own in Joliet. She also found a job to support herself and her children. Wendy insisted that she had done everything that Reyes-Garcia asked.

¶ 29        On December 10, 2018, the trial court ruled that the State had proved by clear and convincing evidence that Wendy and Gregory were unfit. As to Wendy, the court stated: "[A]t the heart of the case is mother's substance abuse. Mother has failed to successfully complete substance abuse treatment within the time period

- 10 -

alleged by the State." The court recognized that she had completed inpatient treatment thereafter. The court scheduled a best interests hearing.

¶ 30    On January 25, 2019, the trial court convened a hearing. George Stuhr appeared on behalf of Wendy. According to Ratajczyk, Drell had a medical emergency and would not be able to participate in further proceedings for an extended period of time. The court asked Stuhr to draft a motion to withdraw and gave Wendy the option of a 21-day continuance to obtain other counsel or proceed with a public defender. Wendy chose the latter option. On April 26, 2019, the trial court held another hearing. Wendy; Margaret Naal, her new public defender; Gregory; Norbut; a CASA for both children; and Ratajczyk were present. The court agreed to appoint an attorney to represent Br., whose wishes diverged from the recommendation of the CASA.

¶ 31    On September 25, 2019, the trial court found by a preponderance of the evidence that it was in the best interests of Br. and Bo. to terminate the parental rights of Wendy and Gregory. The court ordered that DCFS would still be the children's guardian and custodian with power to consent to adoption. Wendy appealed.

¶ 32    A divided panel of the appellate court reversed the trial court's decision and remanded for further proceedings, holding that a *per se* conflict existed because Drell served as Br.'s GAL before she served as Wendy's attorney. 2020 IL App (3d) 190603. Although Wendy did not raise the conflict-of-interest issue before the trial court, the appellate court majority chose to address it, stating that forfeiture is a limitation on the parties and not on a reviewing court. *Id.* ¶ 23.

¶ 33    The appellate court majority stated that both children and parents have a statutory right to counsel under section 1-5 of the Juvenile Court Act of 1987 (705 ILCS 405/1-5 (West 2016)). 2020 IL App (3d) 190603, ¶ 24. That right to counsel includes the right to undivided loyalty by counsel. *Id.* (citing *In re S.G.*, 347 Ill. App. 3d 476, 479 (2004)). Counsel may not represent "conflicting interests or undertake the discharge of inconsistent duties." *Id.* The majority then maintained that the same *per se* conflict of interest rule that originated in criminal law also applies to proceedings under the Juvenile Court Act. *Id.* ¶ 25 (citing *In re W.R.*, 2012 IL App (3d) 110179, ¶ 29). The majority summarized that rule:

"A *per se* conflict arises when a defense attorney has ties to a person that would benefit from an unfavorable verdict for the defendant because the attorney's knowledge of her other client's favorable result might conflict with the defendant's interest and affect counsel's performance in ways that are difficult to detect." *Id.*

¶ 34  The majority discussed *S.G.*, where the appellate court found a *per se* conflict of interest because the mother's court-appointed attorney previously represented the children as the GAL in the same juvenile proceeding, and *In re Darius G.*, 406 Ill. App. 3d 727 (2010), where the appellate court found a *per se* conflict of interest because the parent's court-appointed attorney later represented the child in the same juvenile proceeding. The majority followed those two cases in concluding that Drell's representation of Br. as GAL from 2013 to 2014 and her later representation of Wendy constituted a *per se* conflict. 2020 IL App (3d) 190603, ¶ 28. The majority reasoned:

"Although Drell's representation of different clients was not simultaneous, the goal of the juvenile proceedings was clearly compromised. Any opinion Drell may have developed regarding [Br.'s] best interests in her prior capacity as GAL might have conflicted with [Wendy's] position and affected counsel's ability to represent [Wendy] in the termination proceeding with 'undivided loyalty.' " *Id.*

¶ 35  Justice Wright dissented, asserting that a *per se* conflict of interest exists only when a court-appointed attorney has a contemporaneous relationship with a third party that makes undivided loyalty very difficult. *Id.* ¶ 35 (Wright, J., dissenting) (citing *In re D.B.*, 246 Ill. App. 3d 484, 491 (1993)). Here, there was never contemporaneous representation of Br. and Wendy by Drell. *Id.* Justice Wright highlighted the fact that litigation of the first petition was completed in 2014 and the second petition was not filed until 2016. *Id.* ¶ 38. And in 2018, Wendy "made a choice that gave rise to an argument about [her] attorney's undivided loyalty." *Id.* ¶ 41.

¶ 36  According to Justice Wright, vacating the trial court's order created a perverse incentive:

"[I]f a *per se* conflict of interest exists in this case, then every parent would be wise to replace nonconflicted court-appointed counsel with private counsel, arguably previously tied to another party. This approach *** would guarantee every parent a right to relief from adverse rulings by choosing private counsel with arguable conflicts." *Id.* ¶ 42.

¶ 37   This court allowed the State's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Oct. 1, 2019). Our review of the legal issue presented here proceeds *de novo*. *People v. Green*, 2020 IL 125005, ¶ 19.

¶ 38                                    ANALYSIS

¶ 39   Before addressing the merits, we must decide whether Wendy forfeited consideration of her *per se* conflict of interest claim by not raising it before the trial court. In effect, Wendy created the conflict by hiring Drell, then waited until she lost her parental rights to raise her conflict claim for the first time on appeal. The appellate court majority excused any procedural default, however, by briefly mentioning the proposition that forfeiture is a limitation on the parties and not on the reviewing court. See 2020 IL App (3d) 190603, ¶ 23 (citing *In re D.F.*, 208 Ill. 2d 223, 239 (2003)). While the proposition remains true, the exception to forfeiture principles that it provides is narrow.

¶ 40   "Parents have a fundamental liberty interest in raising and caring for their children ***." *Sharpe v. Westmoreland*, 2020 IL 124863, ¶ 15 (citing *In re N.G.*, 2018 IL 121939, ¶¶ 24-25); see *Obergefell v. Hodges*, 576 U.S. 644, 668 (2015) (stating that the right to " ' "bring up children" is a central part of the liberty protected by the Due Process Clause' " (quoting *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978), quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923))). "Because of the liberty interests involved, courts will not easily terminate those rights." *In re M.H.*, 196 Ill. 2d 356, 363 (2001). And a reviewing court should not easily declare forfeiture of an argument directed at a decision to terminate those rights— particularly where, as here, there is some tension about that argument in the appellate court. Compare *Darius G.*, 406 Ill. App. 3d 727, and *S.G.*, 347 Ill. App. 3d 476, with *D.B.*, 246 Ill. App. 3d 484; see *In re Quadaysha C.*, 409 Ill. App. 3d 1020, 1025 (2011) (describing representation of multiple parties by the same attorney in juvenile proceedings as a "recurring problem"). In order to maintain a

uniform body of precedent and reach a just result, we choose to reach the merits. See *In re Tamera W.*, 2012 IL App (2d) 111131, ¶ 30.

¶ 41    While the sixth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VI, XIV) and article I, section 8, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 8) guarantee the right to counsel in criminal proceedings, the right to counsel in proceedings under the Juvenile Court Act is provided by statute. Section 1-5(1) of the Juvenile Court Act states:

> "[T]he minor who is the subject of the proceeding and his parents *** have the right to be present, to be heard, to present evidence material to the proceedings, to cross-examine witnesses, to examine pertinent court files and records and also, although proceedings under this Act are not intended to be adversary in character, the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2016).

See *In re Adoption of K.L.P.*, 198 Ill. 2d 448, 461 (2002) ("an indigent parent in a termination proceeding brought under the Juvenile Court Act is entitled to court-appointed counsel, not because the due process clause of the Illinois or United States Constitutions mandates it, but because the legislature has chosen to guarantee the assistance of counsel to indigent parents").

¶ 42    The sixth amendment right to counsel implies the right to effective assistance. *People v. Peterson*, 2017 IL 120331, ¶ 79. Though the statutory right to counsel in proceedings under the Juvenile Court Act lacks constitutional footing (see *People v. Lackey*, 79 Ill. 2d 466, 468 (1980) (*per curiam*) (citing *In re Adoption of Hoffman*, 61 Ill. 2d 569, 579-80 (1975)), that right is closely linked to its constitutional counterpart (*In re R.G.*, 165 Ill. App. 3d 112, 127 (1988) (stating that the constitutional right to counsel "has been codified and extended to the parents of a minor who are parties respondent in a proceeding under the Juvenile Court Act")). Both rights imply a right to effective assistance. *In re D.M.*, 258 Ill. App. 3d 669, 673 (1994) (stating that "inherent in the Juvenile Court Act's right to counsel is the right that such counsel be effective"); accord *In re M.D.B.*, 121 Ill. App. 3d 77, 84 (1984); *In re Johnson*, 102 Ill. App. 3d 1005, 1011 (1981). To hold otherwise would render the statutory right illusory. See *R.G.*, 165 Ill. App. 3d at 127 ("It would seem a useless gesture on the one hand to recognize the importance of counsel in proceedings to terminate parental rights—as evidenced by our statutory right for

- 14 -

same—and, on the other hand, not require that counsel perform effectively."); *cf. In re Barbara H.*, 183 Ill. 2d 482, 496 (1998) (refusing to allow the statutory right to counsel in civil proceedings under the Mental Health and Developmental Disabilities Code (405 ILCS 5/3-800 *et seq.* (West 1996)) to be "reduced to no more than an empty formality").

¶ 43        Our rubric for evaluating ineffective assistance claims in criminal cases is the two-prong standard in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). Under that standard, a defendant must show substandard performance by defense counsel and resulting prejudice. *Peterson*, 2017 IL 120331, ¶ 79 (citing *People v. Patterson*, 192 Ill. 2d 93, 107 (2000)). We recognize that there are differences between criminal law proceedings and proceedings under the Juvenile Court Act, but the *Strickland* standard, because of its familiarity and simplicity, offers a helpful structure to guide our analysis.

¶ 44        One aspect of effective assistance is conflict-free assistance—that is "assistance by an attorney whose allegiance *** is not diluted by conflicting interests or inconsistent obligations." *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988); accord *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008); see *People v. Coslet*, 67 Ill. 2d 127, 134 (1977) (stating that the right to counsel "entitles the person represented to the undivided loyalty of counsel"). A conflict-of-interest claim is a specific form of an ineffective assistance claim. Essentially, the party asserting such a claim is arguing that a conflict rendered the attorney's performance substandard and that the substandard performance caused prejudice.

¶ 45        We have recognized two types of conflicts—*per se* and actual. *Green*, 2020 IL 125005, ¶ 20. A *per se* conflict arises when the attorney had or has "a tie to a person or entity" that would benefit from a verdict unfavorable to the client. *Spreitzer*, 123 Ill. 2d at 16. Pursuant to long-standing precedent, there are only three situations in which that occurs:

    "(1) when defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution [citations]; (2) when defense counsel contemporaneously represents a prosecution witness [citations]; and (3) when defense counsel was a former prosecutor who had

- 15 -

been personally involved in the prosecution of the defendant [citation]." *Hernandez*, 231 Ill. 2d at 143-44.

Accord *Fields*, 2012 IL 112438, ¶ 18; *Green*, 2020 IL 125005, ¶ 43.

¶ 46    In those situations, the tie "may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate." *Peterson*, 2017 IL 120331, ¶ 103. A party alleging a *per se* conflict need only show that one of those ties exists (see *People v. Hillenbrand*, 121 Ill. 2d 537, 544 (1988)) and need not show that it affected the attorney's performance (see *Spreitzer*, 123 Ill. 2d at 15). Under *Strickland*, prejudice is presumed. *Green*, 2020 IL 125005, ¶ 21 (" 'allegations and proof of prejudice are unnecessary in cases where a defense counsel *** might be restrained in fully representing the defendant's interests due to *** commitments to others' " (quoting *Coslet*, 67 Ill. 2d at 133)); *Hernandez*, 231 Ill. 2d at 142-43. And the remedy is automatic reversal unless the client waives the conflict. *Green*, 2020 IL 125005, ¶ 24.[2]

¶ 47    In reaching its ultimate holding that there was a *per se* conflict, the appellate court majority followed *S.G.* and *Darius G.*, so we will discuss them. In *S.G.*, the trial court initially appointed one public defender, Brian Wernsman, to represent the mother and one public defender, Michael McHaney, to serve as GAL for her children at the shelter care hearing in neglect proceedings. *S.G.*, 347 Ill. App. 3d at 478. At a subsequent hearing, the trial court vacated the appointment of Wernsman and appointed McHaney to represent the mother and another attorney to serve as GAL. *Id.* In sum, McHaney served as the children's GAL for almost 2 months, and

---

[2]The notion that Wendy did not know of Drell's involvement in proceedings on the 2013 neglect petition before hiring her at the key moment in proceedings on the 2016 neglect petition defies credulity. Wendy was present in court at the shelter care hearing, the adjudicatory hearing, and the dispositional hearing in the former case, and Drell introduced herself at all three hearings and agreed with the State's argument in the dispositional hearing. Wendy was also present at the hearing on the motion to restore her fitness, where her attorney Bembnister indicated that Drell as GAL had no objection and spoke of the "bond" between Wendy and Br. All of the hearings at which Drell appeared, on both neglect petitions, were before the same trial judge.

The record, however, does not indicate that Drell's work as GAL for Br. was mentioned when she appeared in 2018. We have intimated that there is more scrutiny of potential conflicts when counsel is appointed, rather than retained (see *People v. Stoval*, 40 Ill. 2d 109, 113 (1968)), but we have also cautioned about the need to ensure knowledgeable assent to conflicts of interest (see *Coslet*, 67 Ill. 2d at 135). In the absence of facts to show such assent, it is not possible to say that Wendy waived any conflict.

- 16 -

he served as the mother's attorney for almost 3½ years. *Id.* At the close of the proceedings, the mother's parental rights were terminated, and she appealed. *Id.*

¶ 48    The appellate court reversed and remanded. *Id.* The appellate court referred to a parent's statutory right to counsel under the Juvenile Court Act and the accompanying right to effective assistance. *Id.* at 478-79. That right, in turn, entitles the parent to undivided loyalty from the attorney. *Id.* at 479. Consequently, "counsel may not represent conflicting interests or undertake the discharge of inconsistent duties." *Id.* According to the appellate court, that concept is "so central to our profession" that it was formalized in the Rules of Professional Conduct. *Id.* (citing Ill. R. Prof'l Conduct R. 1.9 (eff. Aug. 1, 1990)). The court continued, describing our development of the *per se* conflict of interest rule for "cases where a conflict is created by defense counsel's prior or contemporaneous association with either the prosecution or the victim." *Id.*

¶ 49    The appellate court reasoned that the policy concerns behind the *per se* conflict rule were present there because McHaney "represented parties with adverse objectives at different times in the same proceeding." *Id.* at 480-81. The court noted that the State did not contest that the interests of the mother and her children were "diametrically opposed." *Id.* at 481. The mother sought to retain her parental rights, while McHaney, as the children's GAL, "advocated otherwise." *Id.* The brevity of that appointment did not affect the court's conclusion that the rule applied because the attorney may have formulated opinions about the children's best interests that were not reflected by the record. *Id.*

¶ 50    In *Darius G.*, attorney Erin Buhl represented the mother at two permanency-review hearings in neglect proceedings. *Darius G.*, 406 Ill. App. 3d at 729. A month later at the arraignment on the State's parental rights termination petition, attorney Mike Herrmann represented the mother. *Id.* at 730. Three months later at a pretrial conference, Buhl again represented the mother, and Herrmann appeared on behalf of the child. *Id.* Nothing substantive happened at that hearing; the court simply scheduled a trial date. *Id.* Hermann never made another appearance in the case, but Buhl continued to represent the mother. *Id.* At the close of the proceedings, her rights were terminated. She appealed. *Id.* at 731.

¶ 51    A divided panel of the appellate court reversed and remanded. *Id.* at 739. The appellate court majority stated that, "when the same attorney represents opposing

- 17 -

parties in the course of the same litigation, a *per se* conflict of interest arises and prejudice is presumed." *Id.* at 731. The majority explained that a *per se* conflict occurs when defense counsel has ties to a person or entity that would benefit from an unfavorable verdict for the defendant. *Id.* at 732. The majority recited the three situations of *per se* conflicts identified by this court in that case. *Id.* (citing *Hernandez*, 231 Ill. 2d at 143-44). The majority then dismissed the State's argument that none of the three situations occurred and instead relied upon *S.G.* in holding that the *per se* conflict rule applied because Herrmann appeared on behalf of both the mother and the child. *Id.* at 738.

¶ 52 The appellate court majority acknowledged that, "if there is a spectrum upon which scenarios suggesting conflict might be measured in cases of dual, nonsimultaneous representation in termination cases, this case arguably presents the threshold." *Id.* at 736-37. Herrmann represented the mother at one hearing and represented the child at another hearing. *Id.* at 737. At both hearings, he made no substantive, on-the-record argument. *Id.* The majority found that irrelevant. *Id.* (citing *S.G.*, 347 Ill. App. 3d at 481). Though "the shared goal in juvenile proceedings is to serve the child's best interest," what that best interest may entail "often depends on whose perspective is being considered." *Id.* at 738. According to the appellate court majority, "competing positions clearly may exist within the unified goal of best interest." *Id.*

¶ 53 *S.G.* predated *Hernandez*, where we first used the three-situation formulation of the *per se* conflict rule, so the appellate court's loose application of the rule in that case is perhaps understandable. The appellate court majority opinion in *Darius G.* postdated *Hernandez*. The majority there correctly presented the holding in *Hernandez* and the three situations when a *per se* conflict occurs, then ignored those situations in favor of its own sense of what constitutes a conflicting interest. The analyses in those cases clearly depart from our approach to *per se* conflicts. *S.G.* and *Darius G.* are, therefore, overruled.

¶ 54 Worse still, the appellate court majority in this case did not even mention our approach to *per se* conflicts and the three situations at all. Instead, the majority stated the *per se* conflict rule like this:

"A *per se* conflict arises when a defense attorney has ties to a person that would benefit from an unfavorable verdict for the defendant because the attorney's

knowledge of her other client's favorable result might conflict with the defendant's interest and affect counsel's performance in ways that are difficult to detect." 2020 IL App (3d) 190603, ¶ 25 (citing *Darius G.*, 406 Ill. App. 3d at 732, citing Hernandez, 231 Ill. 2d at 142-43).

In *Fields*, 2012 IL 112438, ¶ 40, we called a similar statement "the justification for the *per se* conflict rule," as opposed to the rule itself, and strongly rejected any interpretation of the statement that would create a fourth situation or an alternate basis for finding a *per se* conflict. The majority in this case did not cite *Fields*.

¶ 55        The appellate court majority had the benefit of *Hernandez* and *Fields*; it just chose not to use them. The State contends that the appellate court majority's analysis was flawed, and we agree. The majority failed to identify which of the three narrow situations created a *per se* conflict here. As we recently reiterated, "this court recognizes only three situations in which a *per se* conflict of interest will be found to exist." *Green*, 2020 IL 125005, ¶ 43. That is a closed set, and any other situations may be examined for an actual conflict of interest. *Id.* ¶ 38. Obviously, the second and third situations did not occur. Drell did not contemporaneously represent Wendy and a prosecution witness, and Drell was not a former prosecutor involved in a criminal case against Wendy. The question becomes whether the first situation occurred. That is, we must determine whether Drell had a prior association with the victim, the prosecution, or an entity assisting the prosecution.

¶ 56        The State argues that Br. was not a victim. Although she was adjudicated neglected, the Juvenile Court Act does not refer to a neglected child as a victim but rather as "the subject of the proceeding." 705 ILCS 405/1-5(1) (West 2016). The State observes that Br. does not meet the definition of "crime victim" under the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq.* (West 2016)). That statute defines "crime victim" as "any natural person determined by the prosecutor or the court to have suffered direct physical or psychological harm as a result of a violent crime perpetrated or attempted against that person or direct physical or psychological harm as a result of" a driving under the influence offense or an involuntary manslaughter/reckless homicide offense. *Id.* § 3(a)(1).

¶ 57        Wendy argues that Drell had a prior association with "the victim"—the children. According to Wendy, her "untreated drug issues *** rendered the minors unwilling recipients of [her] actions which placed them in a position of harm and/or

threat of harm." Wendy quotes definitions of "victim" from Black's Law Dictionary and Webster's dictionary. The former states that a victim is "[t]he person who is the object of a crime or tort." Black's Law Dictionary 1567 (6th ed. 1990). The latter states that a victim is "one that is subjected to oppression, hardship, or mistreatment." Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/victim (last visited Feb. 22, 2021) [https://perma.cc/7T52-998U]. Wendy also asserts that Drell's cooperation with the State at the dispositional hearing on the 2013 neglect petition amounted to assistance for the prosecution.

¶ 58     After making a " 'realistic appraisal' " of Drell's professional relationship with Br. (see *People v. Austin M.*, 2012 IL 111194, ¶ 83 (quoting *People v. Daly*, 341 Ill. App. 3d 372, 376 (2003))), we hold that Drell was not associated with the victim for purposes of the *per se* conflict rule when she acted as Br.'s GAL at three hearings on the 2013 neglect petition. An allegedly neglected minor is not a victim but "the subject of the proceeding" under the Juvenile Court Act, and such proceedings "are not intended to be adversary in character." 705 ILCS 405/1-5(1) (West 2016).

¶ 59     Further, Drell was never associated with the prosecution. Section 2-17(1) of the Juvenile Court Act provides that, when the State files an abuse or neglect petition, the trial court must appoint a guardian *ad litem* to represent the best interests of the child and to offer recommendations to the court consistent with that duty. *Id.* § 2-17(1). In an abuse or neglect proceeding, "a GAL is, in essence, an arm of the court." *Austin M.*, 2012 IL 111194, ¶ 69; see *In re Mark W.*, 228 Ill. 2d 365, 374 (2008) ("A guardian *ad litem* functions as the 'eyes and ears of the court' and not as the ward's attorney."). Traditionally, a GAL is not an advocate for the ward but an adviser to the court as to what is in the ward's best interest. *Id.*; accord *Nichols v. Fahrenkamp*, 2019 IL 123990, ¶ 35 (stating that most Illinois cases treat the GAL as "a reporter or a witness and not as an advocate").

¶ 60     As GAL for Br., Drell acted at the behest of the trial court, not the State. Drell's only substantive comment during proceedings on the 2013 neglect petition indicated that Br.'s best interests aligned with the State's argument simply because her mother was incarcerated. Drell added that Br. needed a stable home until Wendy was released and could engage in services. The appellate court majority speculated

that any opinion that Drell may have developed regarding Br.'s best interests in her prior capacity as GAL in proceedings on the 2013 neglect petition might have conflicted with Wendy's position in proceedings on the 2016 neglect petition. That reasoning is demonstrably false. Drell's opinion about Wendy was favorable. She declined to object to the motion to restore Wendy's fitness, citing the bond between Wendy and Br. We conclude that the appellate court majority erred in holding that Drell operated under a *per se* conflict of interest when she represented Wendy. We repeat: That conclusion would not preclude a parent from asserting an actual conflict of interest claim in a similar context. See *Hernandez*, 231 Ill. 2d at 144 ("If a *per se* conflict does not exist, a defendant may still establish a violation of [the] right to effective assistance of counsel by showing an actual conflict of interest that adversely affected *** counsel's performance."). Wendy did not do that here, so our inquiry ends.

¶ 61 Today, Br. is more than 14 years old. She has spent most of her life in foster care. Reversal here would not affect the 2013 neglect proceedings, which ended when Wendy's rights were restored. Reversal, however, would undo the result of the 2016 neglect proceedings, which ended when Wendy's rights were terminated. Br. would be sent back five years, as if none of this had ever happened. Perhaps that is what she wants, judging from her argument in this case, but we believe that stability and finality are more important. See *In re Kenneth F.*, 332 Ill. App. 3d 674, 679-80 (2002) ("Of primary concern is permanency and stability in the lives of children involved in termination proceedings."); *In re Paul L.F.*, 408 Ill. App. 3d 862, 870 (2011) (Hudson, J., dissenting) ("A *per se* rule that allows—indeed, requires—reversal for an error that is not prejudicial does not strike a proper balance between a party's right to counsel and a child's need for finality.").

¶ 62 CONCLUSION

¶ 63 For the reasons that we have stated, the judgment of the appellate court is reversed, and the judgment of the circuit court is affirmed.

¶ 64 Appellate court judgment reversed.

¶ 65    Circuit court judgment affirmed.

¶ 66    CHIEF JUSTICE ANNE M. BURKE, dissenting:

¶ 67    The issue before this court is whether the doctrine of *per se* conflict of interest extends to proceedings under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2016)) and, if so, whether in this case attorney Lea Drell labored under a *per se* conflict of interest when she represented Wendy M. (respondent) in proceedings to terminate respondent's parental rights. The appellate court held that, because Drell had previously served as guardian *ad litem* (GAL) for one of respondent's children, a *per se* conflict existed. Accordingly, the appellate court reversed the termination of respondent's parental rights and remanded for new proceedings. 2020 IL App (3d) 190603.

¶ 68    A majority of this court now reverses the appellate court's judgment and overrules two appellate cases the court below relied upon. The majority concludes that, although claims of *per se* conflict of interest are cognizable in proceedings under the Act, there was no *per se* conflict in this case. The majority reaches this conclusion because it finds that there are only three situations where a *per se* conflict is recognized and that the circumstances of this case do not fit within the strict parameters of any of those three situations.

¶ 69    I disagree with the majority's conclusion that the circumstances of this case do not give rise to a *per se* conflict of interest. I would affirm the appellate court judgment, reverse the termination of respondent's parental rights, and remand for further proceedings. Therefore, I respectfully dissent.

¶ 70    The rules concerning *per se* conflicts were developed in the context of criminal prosecutions. As we noted in *People v. Green*, 2020 IL 125005, ¶ 21, the term "*per se*" conflict was first coined in *People v. Coslet*, 67 Ill. 2d 127 (1977), to describe a conflict rule that had been adopted in some earlier criminal cases "whereby allegations and proof of prejudice are unnecessary *** where a defense counsel, without the knowledgeable assent of the defendant, might be restrained in fully representing the defendant's interests due to his or her commitments to others." *Id.* at 133 (citing *People v. Stoval*, 40 Ill. 2d 109, 113 (1968)). The *per se* conflict rule recognizes that the constitutional right to effective assistance of

counsel is a fundamental right, which must not be " 'diluted by conflicting interests or inconsistent obligations.' " *Green*, 2020 IL 125005, ¶ 20 (quoting *People v. Spreitzer*, 123 Ill. 2d 1, 13-14 (1988)). Therefore, a *per se* conflict claim is a special type of ineffective assistance of counsel claim.

¶ 71 Since *Coslet*, the *per se* conflict rule has been applied in a number of situations. *People v. Lawson*, 163 Ill. 2d 187, 210 (1994). The common denominator in each of these situations is that we found certain "facts about a defense attorney's status *** engender[ed], *by themselves,* a disabling conflict." (Emphasis in original.) *Spreitzer*, 123 Ill. 2d at 14-15 (listing cases); see also *People v. Hernandez*, 231 Ill. 2d 134, 142 (2008). It is now well established that, in criminal matters, when a defense attorney has ties to a person or entity that might benefit from an unfavorable verdict for the defendant, the " 'situation is too fraught with the dangers of prejudice, prejudice which the cold record might not indicate, that the mere existence of the conflict is sufficient to constitute a violation of [defendant's] rights whether or not it in fact influences the attorney or the outcome of the case.' " *Stoval*, 40 Ill. 2d at 113 (quoting *United States ex rel. Miller v. Myers*, 253 F. Supp. 55, 57 (E.D. Pa.1966)).

¶ 72 The rationale for adopting a *per se* conflict rule is that the defense attorney's past or present commitments "may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate" but raise the possibility that the attorney is unable to effectively represent his or her client. *People v. Peterson*, 2017 IL 120331, ¶ 103. In these situations, prejudice will be presumed, and there is no need—indeed, it may be impossible—to show actual prejudice resulting from the conflict. *Spreitzer*, 123 Ill. 2d at 16. As a result, when a *per se* conflict exists, the court on appeal must reverse unless the conflict was affirmatively waived. *Id.* at 14-17.

¶ 73 In *Hernandez*, we examined cases in which a *per se* conflict was alleged and identified three categories of cases in which a defense attorney representing a defendant in criminal proceedings had been found to have labored under a *per se* conflict of interest:

"(1) when defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the prosecution (*Spreitzer*, 123 Ill. 2d at 14; see also *People v. Lawson*, 163 Ill. 2d 187, 210-11 (1994) (collecting

cases)); (2) when defense counsel contemporaneously represents a prosecution witness (see *People v. Moore*, 189 Ill. 2d 521, 538 (2000); *People v. Thomas*, 131 Ill. 2d 104, 111 (1989)); and (3) when defense counsel was a former prosecutor who had been personally involved in the prosecution of the defendant (see *Lawson*, 163 Ill. 2d at 217-18)." *Hernandez*, 231 Ill. 2d at 143-44 (2008).

These situations are not the *per se* conflict rule itself but a distillation of the circumstances that will give rise to a *per se* conflict. In criminal cases, efforts to expand these situations or add new ones have been rejected by this court. See *Green*, 2020 IL 125005, ¶¶ 37-43; *People v. Fields*, 2012 IL 112438, ¶ 41.

¶ 74　　The case before us is not a criminal case. Moreover, until this case, this court had never before even considered whether the doctrine of ineffective assistance of counsel—which includes recognition of *per se* conflicts of interest—could be extended to proceedings under the Act. Today, by analogizing a criminal defendant's constitutional right to effective assistance of counsel to the statutory right to counsel provided for in section 1-5(1) of the Act (705 ILCS 405/1-5(1) (West 2016)) and by finding that the statutory right to counsel would be meaningless unless it implied the right to effective assistance of counsel, the majority holds that claims of *per se* conflict of interest are cognizable in proceedings under the Act. On this point I agree with the majority. Where I part company is with the majority's application of the *per se* conflict doctrine to this case.

¶ 75　　Rather than consider how the purposes and concepts underpinning the *per se* conflict doctrine in the criminal context might translate to this new context, the majority simply lifts the rules for finding a *per se* conflict in criminal cases and superimposes them, verbatim, on these civil proceedings. This is undeniably not possible. As the majority itself acknowledges, criminal proceedings and proceedings under the Act are quite different. The terminology and rules used to determine whether a *per se* conflict exists in a criminal proceeding logically cannot be applied to the parental termination proceedings in this case.

¶ 76　　The majority holds that Drell did not operate under a *per se* conflict when she represented respondent in parental termination proceedings. The reason offered for this conclusion is that Drell's previous association was with Br., one of

respondent's children, when Drell acted as Br.'s guardian *ad litem* in prior neglect proceedings and that "[an] allegedly neglected minor is not a victim but 'the subject of the proceeding' under the Juvenile Court Act, and such proceedings 'are not intended to be adversary in character.' 705 ILCS 405/1-5(1) (West 2016)." *Supra* ¶ 58.

¶ 77        This reasoning clearly demonstrates the flaw in the majority's analysis. The majority's mechanical application of the *per se* conflict rules for criminal cases to the parental termination proceedings in this case is illogical and improper. In my view, the proper procedure for determining whether Drell labored under a *per se* conflict of interest in this case is to apply the *per se* conflict doctrine first set out in *Coslet*. That is, we should consider whether this is a case where allegations and proof of prejudice are unnecessary because respondent's counsel, without the knowledgeable assent of respondent, might have been restrained in fully representing respondent's interests due counsel's prior commitment as GAL. Undertaking such an analysis, I would find that a *per se* conflict did exist.

¶ 78        Drell's past commitment as Br.'s GAL gave Drell full access to court records and the State's allegations of neglect, as well as information about respondent's background, behavior, and parenting ability. As GAL, it was Drell's responsibility to formulate recommendations regarding the best interests of respondent's child. As such, Drell necessarily formed opinions regarding respondent and her behavior. Further, it is impossible to know whether Drell's involvement as Br.'s GAL had any subtle, subliminal influence on her representation of respondent, which would not be detectable from the record or, perhaps, even to Drell herself but might have affected her ability to represent the respondent's interests effectively.

¶ 79        Even if we were to simply analogize the *per se* conflict situations in criminal cases to this case, I would find the majority erred. The majority finds that Drell did not labor under a *per se* conflict of interest because Br., as the subject of neglect proceedings, was not a "victim." However, in parental termination proceedings, who could possibly be "the victim" if not the children who were abused or neglected to such an extent that they must be permanently removed from the care of their biological parent?

¶ 80        Finally, I note that the majority also rejects the appellate court's judgment, stating:

> "The appellate court majority speculated that any opinion that Drell may have developed regarding Br.'s best interests in her prior capacity as GAL in proceedings on the 2013 neglect petition might have conflicted with Wendy's position in proceedings on the 2016 neglect petition. That reasoning is demonstrably false. Drell's opinion about Wendy was favorable." *Supra* ¶ 60.

This statement demonstrates a fundamental misunderstanding of *per se* conflicts in proceedings under the Act. As noted above, it has been firmly established that a *per se* conflict will be found when facts concerning the attorney's status gives rise to the possibility of a conflict. *Spreitzer*, 123 Ill. 2d at 14; *Hernandez*, 231 Ill. 2d at 142. We have repeatedly acknowledged that finding a *per se* conflict based on the attorney's status is appropriate because the attorney's past or present commitments "may have subtle or subliminal effects on counsel's performance that are difficult to detect and demonstrate" but raise the possibility that the attorney is unable to effectively represent his or her client. *Peterson*, 2017 IL 120331, ¶ 103; *Spreitzer*, 123 Ill. 2d at 16. Reviewing the record to evaluate the level of Drell's involvement when she acted as GAL or searching the record for evidence of an actual conflict is improper. See *People v. Kester*, 66 Ill. 2d 162, 168 (1977) (fact that defendant's attorney previously served as prosecutor against defendant in same case necessitated application of *per se* rule; inquiry into nature and extent of his involvement as prosecutor was not necessary or desirable); *Lawson*, 163 Ill. 2d at 216 (fact of actual commitment to another, not degree or extent of that commitment, dictated application of *per se* rule).

¶ 81 For the reasons set forth above, I would find that Drell operated under a *per se* conflict of interest when she represented respondent at her parental termination proceedings. Accordingly, I respectfully dissent.

¶ 82 JUSTICE NEVILLE joins in this dissent.