NOTICE
Decision filed 11/06/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 240742-U

NO. 5-24-0742

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* MADALYNN F., a Minor | ) | Appeal from the Circuit Court of |
| (The People of the State of Illinois, | ) | Macon County. |
| Petitioner-Appellees | ) | |
| v. | ) | No. 22-JA-200 |
| John J., | ) | Honorable Phoebe S. Bowers, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices McHaney and Sholar concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court's unfitness and best interest orders are affirmed where no argument was presented for the order finding respondent unfit and the order finding it was in the minor's best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2    Respondent, John J., appeals the trial court's June 5, 2024, order terminating his parental rights.[1] On appeal, he argues that the court's order terminating his parental rights was against the manifest weight of the evidence because the factors considered for this issue weighed in his favor,

_____

[1]John's notice of appeal also included the trial court's June 6, 2023, order finding him unfit. However, no argument was presented for this issue on appeal, and it is therefore forfeited. See *People v. Pizzo*, 2022 IL App (2d) 210073-U, ¶ 108; see also Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

1

he was completing the recommended services, and the indefinite order of protection issued against him was inconsequential. For the following reasons, we disagree.

¶ 3                                    I. BACKGROUND

¶ 4       John and Ashley[2] are the biological parents of Madalynn F., born June 10, 2016. On August 22, 2022, Madalynn was removed from Ashley's custody. John was incarcerated at the time of the child's removal. The State filed a two-count petition on August 24, 2022. The first count alleged that Madalynn was neglected because Ashley allowed a registered sexual predator access to her daughter, Madalynn stated she slept in the same bed with Ashley and the registered sexual predator, and her father, John, was incarcerated in the Illinois Department of Corrections (IDOC). The second count alleged that Madalynn was abused due to the substantial risk of physical injury to her based on the same facts.

¶ 5       The Illinois Department of Children and Family Services (DCFS) filed a shelter care report on August 24, 2022. The report revealed that the agency was initially involved with the children in 2007 and became involved again from 2016 to 2017 related to Ashley's unkempt home and fights between Madalynn and her older sister.[3] The agency remained involved but found numerous allegations were unfounded from 2018 to 2022. In November 2021, when allegations of domestic abuse between Ashley and her boyfriend, Joseph, arose, Ashley refused to provide additional information about Joseph. It was later determined, after Joseph was arrested for criminal trespass on August 10, 2022, that Joseph was a registered sex offender, had schizophrenia, and was off his medication. When asked, Ashley stated that she did not know Joseph was a registered sex offender.

_____

[2]Ashley is not a party to this appeal. Information related to her included in this decision is provided solely for context in John's appeal.

[3]John is not the father of Madalynn's sister and information related to her in this decision is provided solely for context in John's appeal.

¶ 6    The shelter care hearing was held on August 24, 2022. Ashley appeared but John did not due to his incarceration. The court found probable cause for the petition and placed the children in shelter care. The court appointed DCFS as the child's temporary guardian and appointed Court Appointed Special Advocates (CASA) as guardian *ad litem* for the children.

¶ 7    On September 28, 2022, John appeared, was appointed counsel, and advised of his rights. The matter was set for an adjudicatory hearing on December 21, 2022. Prior to the hearing, the Center for Youth and Family Solutions (CYFS)[4] prepared a status hearing report. The report indicated that during a counseling session on September 28, 2022, Madalynn took a stick from the game "Pick Up Sticks" and started to pull her pants down and put the stick in her vagina. The counselor stopped the action and referred Madalynn for a Child First interview. The report further noted that Madalynn and her sister were expelled from school on June 15, 2022, due to behavioral problems. When the court discussed the matter with Ashley, she stated that she was "ready to give them up and get rid of them." Ashley reported that both Madalynn and her sister had "been in and out of the psych ward" and both children were on psychotropic medication. The report further indicated that Ashley's boyfriend, Joseph, had not yet completed his sex offender assessment, and his probation officer stated he was noncompliant with the terms of his parole. The probation officer stated it was not in Ashley's or the children's best interest to allow Joseph to return to Ashley's home because Joseph was "very unstable, not appropriate to be around children, and can be very dangerous." Ashley continued to live in her home with Joseph and on multiple occasions advised the caseworkers and supervisor that she and Joseph were in a relationship that she had no intention of terminating.

---

[4]CYFS is a subcontractor for DCFS.

¶ 8     Both parents, and their attorneys, were present for court on December 21, 2022. The adjudicatory hearing was continued and rescheduled for January 31, 2023.

¶ 9     On January 4, 2023, the State filed a motion seeking a finding of unfitness and permanent termination of John's parental rights. The petition alleged that John was unfit due to depravity stemming from his criminal convictions of at least three felonies with at least one taking place within five years of the filing of the motion. The convictions alleged were from Macon County and included the following cases: 2021-CF-1084, 2017-CF-775, 2016-CF-648, 2013-CF-85, 2012-CF-1500, 2011-CF-391, 2007-CF-385, 2004-CF-1285, 2003-CF-1143, and 2001-CF-219. The petition further alleged that John was both previously and currently incarcerated and said incarcerations prevented him from discharging his parental responsibilities.

¶ 10    On January 31, 2023, the adjudicatory hearing was held. The court found Madalynn was abused, in that she was in an environment injurious to her welfare as defined by section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)). The finding was based on Joseph's access to the children and Ashley allowing Joseph to be in a supervisory role. The parties stipulated to the petition allegations and the court set the dispositional hearing for February 27, 2023.

¶ 11    On February 23, 2023, CYFS prepared a status report. As to John, the report revealed that he remained incarcerated at Graham Correctional Center and cooperated with the integrated assessment. He was recommended to participate in services related to domestic violence, mental health, parenting, and substance abuse. He was also recommended to maintain compliance with his psychotropic medication and abstain from future criminal activity. Graham Correctional Center advised CYFS that John was not involved with domestic violence, mental health, or parenting services while incarcerated. The facility indicated that John did participate in substance abuse

treatment from September 19, 2022, to November 1, 2022, until he was removed for disciplinary reasons. The report revealed that John was scheduled to be released in March 2024. His prior convictions included 12 convictions for assault, one for damage to property, and 20 traffic offenses. His most recent arrest was on September 3, 2023, when he was charged with domestic battery and aggravated battery/great bodily harm. He was not participating in visitation. The report further noted there was a current order of protection that precluded John from seeing Madalynn and Madalynn's mental health counselor recommended no contact due to Madalynn's mental health concerns.

¶ 12    Madalynn was initially placed with fictive kin but was later moved to her maternal grandmother's house in December 2022. The grandmother was also the substitute caregiver for Madalynn's sister and requested the sisters be placed together. Since Madalynn moved, the school reported an increase in concerning behaviors in the classroom. Madalynn was in first grade and current classroom concerns included aggressive behavior and racial slurs. On January 26, 2023, Madalynn was moved to shorter school days due to her behavior in school that included hitting, spitting, slapping, biting, kicking, and other aggressive behaviors toward the staff and students. During one episode, Madalynn was chewing on the walls, assaulting the teachers and peers, and destroying school property. Since she was moved to half days, she still had behaviors but not to the previous extent. Madalynn was in counseling and was referred to Intensive Placement Services (IPS) where she remained on a waiting list.

¶ 13    The DCFS family service plan was filed on February 23, 2023. The plan listed John's recommended services but noted he was not participating in any of the services and remained incarcerated at Graham Correctional Center. He indicated a desire to participate in services and wished to have Madalynn returned to his care following his release from prison.

¶ 14    The dispositional hearing was held on March 27, 2023. Following the hearing, the court found it was in the best interest of Madalynn to be made a ward of the court and granted DCFS guardianship. The dispositional order found John was unfit and unable to care for, protect, train, educate, supervise, or discipline the minor and placement with him was contrary to the health, safety, and best interest of the minor because John was incarcerated. The order further noted that John was not involved in any services and that a petition to terminate his parental rights was pending.

¶ 15    John's fitness hearing was held on June 6, 2023. The State submitted certified copies of John's felony convictions for case Nos. 2001-CF-219 (burglary), 2003-CF-1143 (aggravated battery great bodily harm), 2004-CF-1285 (mob action), 2007-CF-385 (aggravated battery), 11-CF-391 (aggravated DUI), 2012-CF-1500 (aggravated DUI), 2013-CF-85 (aggravated DUI), 2016-CF-648 (felony domestic battery), 2017-CF-775 (felony domestic battery), and 2021-CF-1084 (unlawful vehicular invasion). No objection was presented by John's counsel. No further evidence was presented by either the State or John's counsel, and both parties waived argument. Thereafter, the court found the State proved by clear and convincing evidence that John was an unfit parent for the reasons set forth in the January 4, 2023, motion. A best interest report was ordered due by June 26, 2023, and the best interest hearing was scheduled for July 10, 2023.

¶ 16    The best interest report, filed by CYFS on June 26, 2023, revealed that John had not cooperated with the agency. He had not engaged or completed any of the recommended services and had no visitation since the case was opened. He never contacted the agency during the pendency of the case. He remained incarcerated with a projected discharge date of March 9, 2024. The report noted that Madalynn experienced "many episodes of physical and emotional abuse" from John and there was an active order of protection between John and Madalynn.

¶ 17    The report further indicated that Ashley expressed concern with Madalynn being in John's life "due to the violence that has occurred between" Ashley, Madalynn, and John. Ashley further advised the agency that she wanted John's parental rights terminated because she would like Joseph to adopt Madalynn and her sister. The agency did not believe that Joseph's adoption of Madalynn and her sister was in either child's best interest. As to John, the agency stated he had no contact with Madalynn and had "an extensive history of violence that has led to his current incarceration." Those concerns led the agency to believe it was "in the best interest to terminate [John's] rights at this point in the case."

¶ 18    The best interest hearing was held on July 10, 2023. Testimony was provided by Meghan Swiat, the CYFS caseworker. She testified that she did not believe that Madalynn knew John. There was no visitation while he was incarcerated due to an active order of protection. John had not engaged in any services since she received the case in February 2023, and it did not appear that he was ever involved in services. Madalynn said nothing to the caseworker about John. Ms. Swiat did not think it made any difference to Madalynn if John was in her life. On cross-examination, Ms. Swiat confirmed that John was incarcerated while she had the case and stated that it was her understanding that Graham Correctional Center offered some parenting, mental health, and substance abuse classes, but she was unsure if John was ever offered any of the services prior to her involvement with the case. She did not know if John ever lived with Ashley and Madalynn. She agreed that the agency had concerns with Joseph adopting Madalynn. She further stated that she did not think that terminating John's parental rights would impact any of Madalynn's current relationships.

¶ 19    John's sister, Jamie, testified that she had known Madalynn her entire life. She would see Madalynn as often as Ashley would allow it. If John was out of prison, and Ashley was

7

communicating with John, Jamie would be allowed to see her niece. If Ashley was not with John, Jamie would not be allowed to see Madalynn. She stated that Ashley and John intermittently lived together from 2015 to 2021. Based on when she saw John and Madalynn together, they had a good relationship. She stated that Madalynn was very attached to John and loved her dad. He would take her to the store to buy her Barbies and they would play in the front room of Jamie's house. Madalynn was happy to see her aunt and be with her dad. John taught Madalynn how to ride her first bike. Jamie identified photographs with John and Madalynn. Jamie stated that she had not seen Madalynn for over two years. At that point, Madalynn was aware of who her father was and displayed affection for him. She would cry when it was time for her to leave after visiting John and would not want to leave. On cross-examination, she disputed that the interruption in the relationship was due to incarceration; she stated it was due to Ashley.

¶ 20    Jamie's daughter and John's niece, Destiny, testified that she was 16 years old, and had not seen Madalynn in about four years, the last time being a family get-together at Jamie's house. She stated that John would do stuff with Madalynn, took good care of her, watched her, and acted appropriately with her. Madalynn was affectionate toward John, called him daddy, and acted like she was comfortable around him.

¶ 21    John testified that he was Madalynn's father. He stated that he was in the Macon County jail when she was born and remained there for four or five months. When he was released, he went to live with Ashley and Madalynn for about four months. He then went to jail for about three months. When he was released, he went back to live with Ashley and Madalynn for a few more months until he went back to jail. Madalynn was three or four when he went to jail the last time. He agreed that he had a turbulent relationship with Ashley. When he was not in custody, he spent as much time with Madalynn as he could. He stated that when he was incarcerated at the

8

Pinckneyville Correctional Center, Ashley would bring Madalynn for visits. She would also send pictures of Madalynn and let him talk to Madalynn on the phone. When John had two months left on the sentence, Ashley stopped allowing him to have time with Madalynn because Ashley had entered a relationship with John's brother. She also got an order of protection against him while he was still incarcerated. The last time John saw Madalynn was July 7, 2021. After that he was arrested and sentenced to IDOC. He was incarcerated on September 3, 2021. He had a projected release date of March 7, 2024, but could be released sooner. He identified a text from Ashley that stated she was going to lie so he would get put in jail and lose his parental rights. He stated that he received the text after he was arrested for the charges that currently had him incarcerated at IDOC. He stated that Graham Correctional Center did not offer parenting classes. When the first caseworker was going to set up visitation between him and Madalynn, Ashley stopped it based on the order of protection. He stated that he called the caseworker all the time, but the new caseworker would not communicate with him. He sent complaints to the Decatur supervisor and to the Springfield DCFS branch. He stated that he would be willing to engage in the services DCFS recommended once he was released. He stated that he loved his daughter very much and, notwithstanding his history of incarceration, he made an active effort to be in her life.

¶ 22    On cross-examination, John was asked if he presented the text as evidence at his trial. John said he did not because his attorney told him that if there was a trial and John was found guilty, he would be given a long sentence, so he took a plea deal. He agreed that his history included several other felony convictions in which he struck or otherwise harmed Ashley, but stated she was a liar.

¶ 23    The court asked John if he ever tried to open a family case so he could have parenting time with Madalynn. John stated that he did. However, Ashley called him and asked if they could work it out without going to court and John agreed. He said he got to see Madalynn for a little while but

9

then Ashley took her away from him. John believed the filing was in 2020. He discussed the prior domestic abuse cases, and the sentences related thereto. He agreed that he never paid child support and stated he was last employed in 2021. He stated that the children were never around when the domestic violence occurred. He had two other children, but they lived in Louisiana. His parental rights for those children were previously terminated.

¶ 24 Robin Binkley, who worked with Ashley and previously provided childcare for Madalynn before she entered daycare, testified that she knew John. She did not have a lot of interaction with him; however, he called her once and said that he could not get Madalynn to stop crying and did not know what to do. She stated that John "couldn't handle it" and brought Madalynn to her.

¶ 25 Ashley's mother, Stacy, testified that there was an incident where she saw a visible handprint on Madalynn. John and Ashley stopped at Stacy's house because the older daughter needed to use the bathroom. Madalynn was crying hysterically so Stacy walked up to the door and asked what was wrong. She stated, "Daddy hit me," and there was a handprint on Madalynn's leg. She told John that he should not hit her or even spank her. Stacy said that John spun around in his seat, dove over it, got in her face, cussed her, and told her it was his daughter, and he would do what he wanted. Stacy again told him, "We don't hit the kids. Absolutely not. That was absolutely not needed." On cross-examination, Stacy stated that she never told anyone at DCFS or the police about the incident. She agreed that Ashley was with John when the incident occurred and believed it was in 2020. She stated that she did not call DCFS because "[h]e ended up going away" and "the kids ended up not being around him."

¶ 26 Ashley testified that she was Madalynn's mother. She stated that she did not send the text message to John that stated that she would lie and have him sent to prison. She explained that during their last violent episode, John pulled her out of her car, broke her phone, and punched her

10

in the face several times. She jumped in her car and left. She explained that John had all the passwords to her social media. After the car incident, Ashley went straight to John's probation officer. She said that the probation officer saw her broken phone and that John sent the text message to himself from Ashley's Facebook pretending to be her. She disputed ever stating that she would lie to get him in trouble and said she had several people who saw the bruises and marks John left on her over the eight years they were together.

¶ 27    Ashley also disagreed with John's testimony that none of the domestic violence incidents occurred in front of the children. She stated that the children were removed from her care in 2017 because of the violence that occurred in front of them. That violence was why the order of protection included Madalynn. She stated that she did not visit John in prison when he was incarcerated the last time. She did not recall visiting him for other offenses either. Ashley identified a photo of her and Madalynn and read the writing on the back that said, "Taking Madalynn to see John when he was in Pinckneyville Correctional Center." She stated the writing was not her handwriting and denied that the photo was taken on the way to visit John at the penitentiary. She agreed that John would spend the night at her house when he was not in jail. She also agreed that he was involved in Madalynn's life "off and on." She claimed, however, that John did not come over to see Madalynn; he used that as an excuse to see her saying, "It was basically just to get to me. He would use her as *** an excuse for me to come around."

¶ 28    Ashley agreed there were times when she denied visits between John and Madalynn but stated it "was always after he had hit me, and I didn't feel safe with Madalynn going with him alone." She stated that she did not trust John's sister or John's mother either. She let John have Madalynn one time and it took a day and a half of begging to get her back. When she threatened to call the police because he would not return Madalynn, he threatened to call DCFS with false

11

allegations about her. After that incident, she would not let John see Madalynn alone because she did not want to risk it. She also disputed calling John, after he filed court papers for visitation, to request they just work it out between them. She stated that she was not allowed to have social media unless John had the password for it.

¶ 29    Ashley agreed that she was currently in a relationship with Joseph, and they talked about him eventually adopting Madalynn. She admitted that Joseph was currently incarcerated, and he was a convicted sex offender.

¶ 30    Following arguments, the court noted that John had not been in Madalynn's life for most of her life and was mostly incarcerated during that time. However, it further noted that when John was out of jail, he did have a relationship with his daughter. The court noted that Madalynn was only seven years old, and that John had not seen her for two years. It further noted that John testified that classes were not available while he was incarcerated and that he would likely be released sooner than expected. It then stated,

"I think, for me, that's what changes things. If the outdate was 2025, she would be ten ***, but if he gets out December of this year and starts on services right away, *** he may have a chance of getting his services completed and showing everybody that he can be a fit parent to this girl.

I think it is premature. I do think [Ashley] has some motives here that I'm not sure this next guy, who's currently in prison for domestic battery, would be another good fit for this child. So[,] I'm not going to terminate [John's] parental rights—not right now. I'm not saying that this won't come up in the future, but I think it's premature at this point in time to do so. He needs to be given a chance when he does get out to do his services."

Thereafter, the court acknowledged the order of protection and stated it did not think Madalynn "should have to see her dad while he's in prison."

¶ 31    A status report was filed by CYFS on September 14, 2023. As to John, the report noted that he remained incarcerated. He had not participated in any services except for the substance abuse class he took for two months in 2022 before he was removed for disciplinary reasons. He had no visitation with Madalynn. The report noted that Madalynn was doing better in school with half days. She was receiving mental health counseling that became more regular after August 2023 but was still sporadic. Her progress was slow.

¶ 32    CASA also filed a report with the court. It stated that Madalynn, who was now aged seven, was a considerate and friendly girl. She was shyer than her sister but warmed up quickly. She was doing better with her behavior at school with half days and said she liked school and her friends. She struggled with her behavior. The sisters played well together and loved each other. Madalynn was in counseling and was up to date with her immunizations and medical appointments. CASA was concerned that Madalynn would fall farther behind at school.

¶ 33    A permanency hearing was held on September 27, 2023. The court found that John made neither reasonable effort nor reasonable and substantial progress toward returning the minor home because he "is in prison until 2025."

¶ 34    On March 13, 2024, CASA filed a status report in anticipation of the next permanency hearing. As to Madalynn, the report noted that she was behind academically in school and struggled deeply so they were considering a different school. She was still in counseling and took several medications to address behavioral concerns. She struggled with opposition and regulating her emotions. A referral for a psychological evaluation was recommended. She was a good eater and sleeper. She loved Ashley and had a strong bond with her. Unsupervised visits went very well.

The report further noted that Madalynn referred to John as "bad daddy" and Joseph and "good daddy." CASA was concerned with Madalynn's behaviors at school, her mental health, and her falling farther behind educationally. The report further noted that Ashley believed her safety, and the children's safety, were at risk from John and that it was necessary to extend the order of protection. Ashley was no longer with Joseph due to his relapse with substance abuse and mental health crisis. She also filed for an emergency order of protection against Joseph but missed the case being called because she was paying the meter where her car was parked. Therefore, the request for an order of protection against Joseph was dismissed.

¶ 35     As to John, CASA had no contact with him until the court hearing for Ashley's order of protection hearing against him on February 29, 2024. That hearing was ultimately continued until April 2024. The CASA report indicated that John was released in December 2023. The former caseworker told CASA that she and her supervisor had one interaction with John while he was incarcerated, and it was "unpleasant." John stated that he wanted to see Madalynn while they were at the hearing on February 29, 2024. He asked about her favorite cartoons, hobbies, and food. He stated that he was currently in domestic violence classes and would do whatever they wanted him to do. He denied allegations made against him by Ashley. The CASA report stated that John told the agency that Ashley and Joseph were still together. CASA was concerned that John was not fully engaged in his service plan. It was also concerned that if the order of protection was dropped, and visitation began, that reintroducing John into Madalynn's life "would have a significant impact on her mental health and the progress she has made."

¶ 36     DCFS provided a permanency hearing report on March 13, 2024. The report found Ashley made satisfactory progress and reasonable efforts to returning the children. It also found John made reasonable efforts but did not have satisfactory progress. The report noted that John was released

14

on December 29, 2023. His goals included cooperation with CYFS and DCFS, counseling, completing a parenting assessment, substance abuse assessment, obtaining suitable housing and employment, providing evidence of completion of his domestic violence class, and refraining from further illegal activities. He was on parole until January 1, 2025. The report noted that the order of protection issue was deferred until the hearing on April 24, 2024. The report further noted that the children were scheduled to return home to Ashley on March 25, 2024, and that the agency recommended a return home to Ashley.

¶ 37    CYFS filed a permanency report addendum on March 22, 2024. It stated that the caseworker referred John to Heritage Behavioral Health for a mental health assessment. John advised that he completed a substance abuse treatment while incarcerated and showed video proof of completion on March 14, 2024.

¶ 38    On March 26, 2024, Ashley's attorney filed a supplemental motion seeking a finding of unfitness and permanent termination of John's parental rights. The motion alleged that John was previously found unfit on July 10, 2023, and, since that finding was issued, John had "not been restored to fitness or made reasonable efforts to be restored to fitness."

¶ 39    A permanency hearing was held on March 27, 2024. The court issued a permanency order finding that Madalynn was ready to begin aftercare with Ashley, and that Ashley made reasonable and substantial progress and provided reasonable efforts in returning the minor home. The court found that John had not made reasonable effort or reasonable and substantial progress toward returning Madalynn home. Physical custody was returned to Ashley with legal custody remaining with DCFS.

¶ 40    On May 21, 2024, CYFS filed a best interest report. It noted that an order of protection was granted against John for Madalynn and Ashley "indefinitely." The report noted that John stated he

15

completed his domestic violence class but did not allow the worker to keep the letter showing proof of involvement. He said that he was willing to participate in services but often became angry with the worker to the point of yelling at the worker and calling her profane names. He also stated that he completed a mental health evaluation and was not recommended for services. He signed consents and showed a copy of the letter to the worker. The report indicated that John did not understand the purpose of his completing services since the court granted physical custody to Ashley. John would argue that he should not have to participate in services since he was not a factor in why the children were taken. He would then state that he would do the services but continued to raise his voice and curse at the worker. The report noted that John had no visitation, and the new order of protection was granted "indefinitely." Since John was unable to have a relationship with his daughter, the worker was unable to provide commentary on his parental capacities. Madalynn was now living with Ashley and was closely bonded to her. She saw a counselor and was placed in Garfield Park Behavioral Hospital in March where she stayed to receive assistance with her behavior and medications. She was released on April 13, 2024, and placed with Ashley. The report recommended termination of John's parental rights based on his inability to have contact with Madalynn due to the order of protection.

¶ 41    DCFS filed a permanency hearing report on May 21, 2024. The report noted John's frustration with having to participate in services when he was not involved in the case opening. He argued that the agency was against him. He also provided a photo of his letter from Heritage stating he completed the mental health and substance abuse evaluations and was not recommended for treatment. The report noted that John had not completed a parenting assessment. John had a house in Harristown and was painting houses for income; however, no proof of employment was

16

provided. He was currently taking domestic violence classes. Madalynn was doing well with Ashley, but she continued to struggle with school and Ashley recommended increased therapy.

¶ 42    CASA filed a report on May 31, 2024. The report confirmed John's last contact with Madalynn was on July 7, 2021, and that Madalynn was living with Ashley. It noted that Ashley had a history of protective orders against John that included Madalynn, and on May 3, 2024, the court extended the order "indefinitely" against John. The report noted John's "extensive criminal history" and classified his relationship with Ashley as "toxic and violent." The report noted that Madalynn referred to John as "bad daddy" and stated he "jumped on mommy and hurt her." She did not like to talk about John.

¶ 43    The CASA report noted that DCFS and John were communicating, and he advised DCFS that he would do whatever they wanted. He stated that he had a strong relationship with Madalynn, and it was he, not Ashley, who could stop Madalynn from crying. He expressed frustration with not being able to show the agency the relationship between him and Madalynn because of the order of protection. He denied the allegations against him by Ashley. The report recommended the court find it was in Madalynn's best interest to terminate John's parental rights.

¶ 44    The best interest hearing was held on June 12, 2024. CYFS foster care worker, Abigal Paul, testified that she believed it was in Madalynn's best interest to terminate John's parental rights. She stated that John last had contact with the child on July 7, 2021, due to an order of protection and his incarceration. Madalynn was now living with her mother. She was bonded to her and Ashley took good care of her. She was receiving the medical and psychiatric help she needed, and Ashley was supportive of that process. Madalynn's sister also lived with them and the siblings behaved as siblings do; sometimes they were best friends and sometimes they hated each other.

¶ 45    The worker took over the case in February after John's release. At that time, John had not participated in any services except a domestic violence class through his parole. He was not recommended for mental health treatment following his assessment. She could not remember if John completed a substance abuse class while incarcerated.

¶ 46    She stated that her interactions with John were "quite negative." He disputed his need for services since he was not around when the case opened and cursed at her about that. Most of the phone calls ended with John becoming irate and irritated with borderline outbursts toward the worker. She found his behavior concerning. She said it was not possible for Madalynn to be returned to her father because there was a current indefinite order of protection. Since there was no visitation, the worker could not observe any type of bond between John and Madalynn.

¶ 47    On cross-examination, the worker stated that Madalynn referred to John as "bad dad" but did not explain to the worker why she believed that. Madalynn never requested contact with John. He continued to participate in domestic violence classes. She believed John completed substance abuse classes.

¶ 48    CASA supervisor, Gailan Leeds, testified that Madalynn was currently okay but had ongoing challenges with her mental health that were being addressed by her physician, her mother, and the agency. They had no concerns about John because he was not interacting with Madalynn due to the order of protection. Given Madalynn's mental health issues, Ms. Leeds believed it would be difficult and hard for Madalynn to understand why she would be placed with John. Ms. Leeds believed it was in Madalynn's best interests to terminate John's parental rights. On cross-examination, she testified that Madalynn would not tell her the name of her dad and shut down after being questioned about it. Ms. Leeds believed that some of Madalynn's problems stemmed from witnessing the violence. She stated that John had not seen Madalynn since July 2021.

18

¶ 49    The State requested the court take judicial notice of case Nos. 2017-CF-775 and 2021-CF-1084. The State explained that Ashley was the victim in both cases. The 2017 case was for domestic battery and the 2021 case was for vehicular invasion. It was the latter case that sent John to IDOC and was the basis of the current order of protection. Thereafter, the State rested.

¶ 50    John testified that he was Madalynn's father and was incarcerated until December 2023. Since he was released, he started his own business painting houses and completed everything that DCFS asked him to do except for eight domestic violence classes. He stated that following the mental health assessment no treatment was recommended, and he completed the substance abuse program while incarcerated. He expressed difficulty in communicating with the caseworker because she would not return his call. He stated that the court did not terminate his rights at the first hearing because it wanted to see what he did when he got out. He had not seen Madalynn since July 2021 because of the order of protection and his incarceration. He stated that he did not attend the April 2024 order of protection hearing because he had his days mixed up and thought it was on April 8. He had planned to go. He complained that the juvenile case had nothing to do with him, but they made it all about him. He wanted the chance to show that he could be a father to Madalynn. He was currently in the process of modifying the order of protection but was waiting to see what happened at this hearing. He stated that his outbursts with the caseworker were due to his frustration that none of the juvenile case was because of him and the children were removed because Ashley was involved with a sex offender. He stated that prior to his incarceration, Madalynn loved him. She always wanted to go with him, and he did not believe that she no longer wanted to see him.

¶ 51    On cross-examination, John confirmed that he had an attorney for the order of protection case. John also confirmed that he did not appear at the order of protection hearing. His attorney

was present at that hearing, and the order or protection case proceeded without John present. He stated that he believed his failure to appear played a role in the order of protection being extended. He confirmed that he was previously incarcerated in IDOC three times and stated that Ashley filed numerous orders of protection against him but would later drop them.

¶ 52    The court asked John if he knew anything about his daughter and he said, "Yeah. Not now, but I do from before, when I was around her." He acknowledged that he had not seen her for three years due to his actions and incarceration. He agreed that he pled guilty to vehicular invasion as part of a plea bargain and got 3 years instead of 15. The court further confirmed that the hearing for the extension of the order of protection was held on May 3, 2024, and John did not appear.

¶ 53    Following the hearing, the court noted that John was incarcerated most of Madalynn's life and stated there was no evidence of any bond or relationship between Madalynn and John. It found that John had no contact with his daughter since July 2021 due to the vehicular invasion conviction, of which Ashley was the victim, and thereafter she obtained an OP against John. The court noted that although John had an attorney for the proceedings, he "did not bother" to attend the hearing set to address Ashley's petition to extend the length of the protective order. The court also noted the caseworker's testimony about John's concerning conversations and erratic behavior. The court further noted Madalynn's mental health issues and found she was "currently stable at home with her mother and sister, and her mental health issues are being addressed." The court then considered the best interest factors and stated the following:

> "If you consider the best interest factors provided by the statute, the child is currently physically safe with her mother. The child has a sense of attachment with her mother and sister. She refers to [John] as 'bad dad.' I would say that she would not feel a sense of security or familiarity with [John].

20

This child needs permanence. I agree with [the GAL]: If we do not terminate [John's] parental rights at this point, he may try to be a part of her life in the future, and with her considerable mental health issues and the lack of contact for the last three years, it does not sound like that would be in her best interest.

Therefore, for *** those reasons, I do find it's in the best interest of Madalynn to have [John's] parental rights terminated."

John timely appealed.

¶ 54                                II. ANALYSIS

¶ 55    John's notice of appeal requested review of the June 6, 2023, order finding him unfit and the June 5, 2024, order terminating his parental rights. However, on appeal, John's counsel declined the opportunity to present argument on the trial court's finding of unfitness, specifically conceded that no reasonable argument could be presented for the trial court's finding of unfitness, and limited the argument to the court's best interest finding. Accordingly, we find the issue of unfitness affirmatively waived. See *Gallagher v. Lenart*, 226 Ill. 2d 208, 229 (2007) (explaining that waiver consisted of an intentional relinquishment of a known right, while forfeiture involved the failure to make the timely assertion of the right).

¶ 56    Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). After a petition for involuntary termination is filed under the Juvenile Court Act, a two-step process is required for parental rights termination. See 705 ILCS 405/2-29(2) (West 2022). "The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds of unfitness enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018))." *In re J.C.*, 2020 IL App (2d) 200063, ¶ 27.

21

¶ 57    After a trial court finds the parent unfit, the cause proceeds to the second step and the trial court determines whether it is in the best interest of the child to terminate parental rights. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1071 (2006). At this proceeding, the "issue is no longer whether parental rights *can* be terminated; the issue is whether, in light of the child's needs, parental rights *should* be terminated." (Emphases in original.) *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The focus shifts to "the child's interest in a stable, loving home life." *Id.*

¶ 58    In reaching its best interest determination, the trial court must consider, in the context of the child's age and developmental needs, the following statutory factors:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009).

Additional factors include " 'the nature and length of the child's relationship with the present caretaker' and the effect that a change of placement would have upon the emotional and psychological well-being of the child." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005) (quoting *In re Violetta B.*, 210 Ill. App. 3d 521, 534 (1991)), *abrogated on other grounds by In re M.M.*, 2016 IL 119932, ¶ 31. "[N]o factor is dispositive." *In re Austin W.*, 214 Ill. 2d at 50. A court's best interest

finding will not be reversed unless it is contrary to the manifest weight of the evidence. *In re Jay. H.*, 395 Ill. App. 3d at 1071.

¶ 59 On appeal, John's counsel argues that review of the statutory factors did not fall in favor of terminating John's parental rights. While John's brief listed the statutory factors, additional argument regarding which, if any, of the factors opposed termination of John's parental rights, was not presented. The omission of argument in this section was noted by the State. In response, John argued that the burden of proof was on the State, not John.

¶ 60 While we agree that the burden of proof remains with the State during the best interest hearing (*In re Jaron Z.*, 348 Ill. App. 3d 239, 261 (2004)), that statutory burden does not relinquish an appellant's duty to present argument on the issue on appeal. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."). However, forfeiture is a limitation on a party, not this court. *People v. Morgan*, 2023 IL App (4th) 220377, ¶ 19 (citing *Hux v. Raben*, 38 Ill. 2d 223, 224 (1967)). "[R]eviewing courts may look beyond considerations of forfeiture 'to maintain a sound and uniform body of precedent or where the interests of justice so require.' " *Id.* (quoting *Halpin v. Schultz*, 234 Ill. 2d 381, 390 (2009)). As this case involves John's fundamental rights to make decisions regarding the care, custody, and control of Madalynn (see *In re Parentage of Scarlett Z.-D.*, 2015 IL 117904, ¶ 31 (citing *Troxel v. Granville*, 530 U.S. 57, 65-66 (2000) (plurality opinion))), we choose to overlook John's forfeiture. See, *In re Br. M.*, 2021 IL 125969, ¶ 40 ("[A] reviewing court should not easily declare forfeiture of an argument directed at a decision to terminate [parental] rights ***."); *In re Z.L.*, 2021 IL 126931, ¶ 88 ("[G]iven the fundamental liberty interest of a parent to raise and care for her children as protected by the United States Constitution, we will overlook K.G.'s forfeiture."); *In re K.G.*, 2023 IL App (5th) 230148-U, ¶ 23

(declining to strike a brief for failure to comply with Ill. S. Ct. R. 341); *In re H.B.*, 2022 IL App (2d) 210404, ¶ 43 (same).

¶ 61 On review, we find that even if the issue was not forfeited, most of the statutory factors do not support retention of John's parental rights. First, there is an indefinite order of protection issued by the circuit court in a different proceeding. That order directly controverts any argument that Madalynn's physical safety and welfare would be bolstered by John retaining his parental rights. Further, the evidence revealed that John last saw the child over three years ago due to his incarceration and the order of protection. This period encompassed nearly half of Madalynn's life in which John did nothing to develop her identity. While Madalynn had a history of attachments that involved both Ashley's and John's families, no one in John's family had seen Madalynn for four years.

¶ 62 The evidence also revealed that Madalynn was deeply attached to Ashley and would emotionally shut down when John's name was mentioned by a caseworker. There was no evidence submitted that Madalynn had any interest in spending time with John. She was in a school where she made friends and was trying to overcome her behavioral issues. There was no evidence of any stability or a continued relationship between Madalynn and John during or after his release from incarceration. Additionally, Madalynn's counselor, as well as the agencies involved, expressed concern about Madalynn's emotional and psychological well-being if John was reintroduced into her life. Therefore, it is apparent that only one factor weighed in John's favor and that was his personal preference. Given the lack of evidence in John's favor regarding the other statutory factors, we cannot agree with John's claim that that review of the statutory factors did not fall in favor of terminating John's parental rights.

¶ 63   John next argues that the trial court unfairly stated he would be given an opportunity to complete his services and, in the time between the two best interest hearings, he had almost completed the services, yet his rights were terminated. We disagree because John misconstrues the trial court's statement. Following the first best interest hearing, the court found the best interest issue "premature" and stated, "but if he gets out December of this year and starts on services right away, *** he may have a chance of getting his services completed and showing everybody that he can be a fit parent to this girl." While the court's statement was made during the best interest hearing, it clearly indicated that it was addressing John's fitness to parent Madalynn.

¶ 64   As noted above, John was found unfit based on a finding of depravity due to his numerous felony convictions. "There is a rebuttable presumption that a parent is depraved if the parent has been criminally convicted of at least 3 felonies *** and at least one of these convictions took place within 5 years of the filing of the petition or motion seeking termination of parental rights." 750 ILCS 50/1(d)(i) (West 2022). "Because the presumption is rebuttable, a parent is still able to present evidence showing that, despite his convictions, he is not depraved." *In re J.A.*, 316 Ill. App. 3d 553, 562 (2000).

¶ 65   Contrary to the argument presented by John on appeal, the court's language clearly provided John additional time to complete his services and provide rebuttal evidence for the presumption of unfitness. Despite this allowance, at no time did John, or his trial counsel, request reconsideration of the court's June 6, 2023, order finding John unfit. John's failure to request reconsideration does not equate to a conclusion that the trial court was unfair. Accordingly, we disagree with John's argument that the trial court unfairly stated he would be given an opportunity to complete his services, and despite almost completing the services, still terminated his parental rights.

25

¶ 66    Even if this court agreed with John's claim that the court's allowance of additional time was geared toward best interest, our agreement would not change the outcome. Evidence of completed services or refraining from objectionable conduct "is appropriately considered at the second stage of the termination hearing, at which the court considers whether it is in the best interest of the minor that parental rights be terminated." *In re C.W.*, 199 Ill. 2d 198, 217 (2002).

¶ 67    Here, while evidence was submitted revealing that John nearly completed his services, there was also evidence submitted revealing that John's current behavior was "concerning" to the trial court. This behavior included cursing and using profane names toward the caseworkers and exhibiting anger and frustration at having to complete services when Madalynn was removed for Ashley's actions, not his. When John was released from incarceration, one of his goals included cooperation with the agencies. Regardless of how many other services were completed, cursing and calling caseworkers profane names is inconsistent with "cooperating" with the agencies involved.

¶ 68    Nor do we find John's anger and frustration that he had to complete services because Madalynn was removed from Ashley's care for reasons that did not involve him reason to absolve him of the responsibility of completing his service goals. It is undisputed that Madalynn was taken into care due to Ashley's relationship with a convicted sex offender. While John was not involved in Ashley's decisions regarding her relationships, it is clear John was unavailable to parent his child when Madalynn was removed from Ashley's care.

¶ 69    The reason for John's unavailability was his incarceration for vehicular invasion. As such, despite John almost completing his services, his aggressive and belittling language toward the caseworkers is concerning given his violent history. His two most recent convictions for domestic battery and vehicular invasion raise concerns related to the volatility of John's temper and his

26

ability to manage his anger. We also note that while John claimed that he was self-employed, no evidence of his occupation was ever presented to the caseworkers. Therefore, we find no merit in John's claim that the trial court "unfairly" stated he would be provided an opportunity to complete services and, despite completing nearly all of them, still terminated his parental rights.

¶ 70  Finally, John argues that the trial court's issuance of an indefinite order of protection is irrelevant because he planned to have the order modified. We again disagree. The evidence revealed that the current protective order was issued due to John's actions against Ashley in the vehicular invasion case. The evidence also revealed that the most recent proceedings extended that order, and that John did not even bother to attend that hearing. However, that underlying singular event does not erase the previous domestic abuse violence against Ashley, some of which Madalynn witnessed. By John's own testimony, Ashley filed numerous petitions for protective orders against him.

¶ 71  The first statutory factor for consideration at the best interest hearing is the child's physical safety and welfare, with the latter including "food, shelter, health, and clothing." 705 ILCS 405/1-3(4.05)(a) (West 2022). The central inquiry for any proceeding addressing an order of protection is whether the petitioner was abused. *Best v. Best*, 223 Ill. 2d 342, 348 (2006). "If the court finds that petitioner has been abused ***, an order of protection prohibiting the abuse *** shall issue ***." 750 ILCS 60/214(a) (West 2022). Here, the order of protection included both Ashley and Madalynn. While the underlying evidence in the protective order hearing was not submitted in these proceedings, there was evidence submitted at the first best interest hearing that John hit Madalynn and disagreed with Madalynn's grandmother about whether a child should, or could, be hit.

¶ 72 Equally relevant is the fact that the most recent protective order hearing was held on May 3, 2024. The best interest hearing was held on June 5, 2024. While John argues that he was hampered by the protective order and unable to show the agencies his bond with Madalynn, the reason for this lack of evidence was John's own failure to appear at the protective order hearing and failure to immediately request reconsideration of the order. While John contends the order is "inconsequential" because it was in effect at both hearings, this court cannot agree when John had the ability to request dismissal or modification of the order but failed to pursue the option. Accordingly, we cannot find that the indefinite order of protection was inconsequential.

¶ 73 None of John's arguments have merit. Accordingly, we hold that the trial court's order finding it was in Madalynn's best interest to terminate John's parental rights was not against the manifest weight of the evidence.

¶ 74                                    III. CONCLUSION

¶ 75 For the above-stated reasons, we hold that the trial court's order terminating John's parental rights was not against the manifest weight of the evidence.

¶ 76 Affirmed.