NOTICE

Decision filed 03/16/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250850-U

NOS. 5-25-0850 and 5-25-0851, cons.

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* BERRY B. and ROBERT B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Pope County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | Nos. 23-JA-7 and 23-JA-8 |
| | ) | |
| Robert B., | ) | Honorable |
| | ) | Melissa A. Presser, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Hackett and Clarke concurred in the judgment.

**ORDER**

¶ 1 *Held*: The circuit court's judgment terminating Father's parental rights was not against the manifest weight of the evidence where the State met its burden of proving that the respondent was unfit to parent. Furthermore, Father failed to show that he was denied effective assistance of counsel. Therefore, the judgment of the circuit court is affirmed.

¶ 2 In this consolidated appeal, the respondent, Robert B. (Father), appeals from the October 7, 2025, order of the Pope County circuit court terminating his parental rights over his two minor sons. On appeal, Father challenges the finding of unfitness and argues that he was denied effective assistance of counsel. For the reasons explained below, we affirm.

1

¶ 3                    I. BACKGROUND

¶ 4    This case began on June 20, 2023, when the State filed petitions for adjudication of wardship of two minors,[1] Berry B., born in March 2019 and Robert B., born in February 2018. The petitions identified Father and the minors' mother (Mother)[2] as their parents. The State alleged that the minors were neglected pursuant to subsection 2-3(1)(a) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a) (West 2022)), for not receiving the care necessary for their wellbeing due to a lack of adequate shelter, specifically because the home had no running water since March 2023. The State also alleged that the minors were neglected pursuant to subsection 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)), due to an environment injurious to their welfare. The State asserted the minors' environment was injurious to their welfare because they were present in the home when Mother inflicted physical injury upon their 12-year old half-sister[3] on two occasions by throwing her to the floor, pushing her around, stepping on her, and biting her hand.

¶ 5    Following a shelter care hearing held the same day, the circuit court entered an order granting shelter care and appointing the Department of Children and Family Services (DCFS) as the minors' temporary guardian. DCFS and Caritas Family Solutions (Caritas) filed a service plan for Father dated July 26, 2023. It included recommendations for Father to participate in mental health services, to obtain safe and appropriate housing for the minors, to undergo substance abuse assessment and testing, to learn and utilize appropriate parenting techniques, to participate in a

_____

[1]This appeal arises from both minors' cases, case No. 23-JA-7, regarding Berry B., and case No. 23-JA-8, regarding Robert B. In our discussion, we will refer to singular petitions, motions, and orders for simplicity, but we refer to the filings and proceedings in both underlying cases.
[2]Mother is not a party to this appeal and will only be mentioned where relevant to Father's appeal.
[3]A case was also opened for the half-sister. However, as she has a different father than the two male minors, Father is not a respondent in that case. The female minor is relevant to this case only in that she testified against Father at the adjudication hearing, and this fact underlies a portion of Father's claim of ineffective assistance of counsel on appeal.

2

domestic violence assessment and counseling, to participate in anger management classes, and to obtain legal employment and provide proof of that income.

¶ 6                    A. Adjudication of Neglect and Initial Proceedings

¶ 7    On January 17, 2024, the circuit court held an adjudication hearing, which could not be completed on that date and was continued to February 9, 2024. On the February date, the circuit court entered a written adjudicatory order finding, by stipulation of the parties, that the minors were neglected due to a lack of support, education, and remedial care (705 ILCS 405/2-3(1)(a) (West 2022)) and an environment injurious to their welfare (705 ILCS 405/2-3(1)(b) (West 2022)). The dispositional hearing took place on March 6, 2024. The circuit court entered a dispositional order on that date, making the minors wards of the court and placing the minors in the custody of the Guardianship Administrator of DCFS. Further, the order found Father unfit and unable to parent the minors because he needed to complete the services and tasks outlined in his service plan to correct the conditions that brought the minors into care. The circuit court further found the tasks on Father's service plan to be appropriate, except for the mental health requirement, stating that no basis existed at the time for such services to be necessary. The circuit court determined that Father's integrated assessment and the caseworker testimony had not provided an individualized basis for why he was assigned mental health services, particularly where he was not identified as the perpetrator of the physical abuse in the household.

¶ 8    Caritas filed a permanency report dated April 17, 2024. According to the report, Father had made neither reasonable efforts nor progress towards the return of the minors. The report described an incident that took place on April 11, 2024, in which the minors' foster parents found tracking devices (AirTags) on both children. One of the minors reported that Mother put the AirTag in his pants and told him it would keep him safe. Mother denied this, saying the minors took the AirTags

3

themselves, without her knowing. A cell phone was also found on one of the minors, through which the parents could communicate with him unsupervised. The minor said that Mother gave him the phone. As a result of this incident, Caritas suspended both parents' visitation.

¶ 9 Regarding Father's service plan, the report indicated that he was referred to a parenting program, but was unable to move forward with it due to the suspension of visitation following the AirTag incident. He was told to call another program provider, Centerstone, but did not do so. He was also told to contact Centerstone about substance abuse services, which he also had not begun. Before the AirTag incident, Father's visitation was going well, with no noted issues. On housing, the parents' home passed a home safety assessment on February 16, 2024, and caseworkers indicated that it was clean during visitation. Father had submitted a paystub in November 2023 and reported that he had a steady job, but Caritas had not received any further income verification from him. Lastly, regarding mental health, the report stated that after further review of his integrated assessment and observation of the dynamic between Father and Mother, the agency recommended adding mental health services back to Father's service plan, with a focus on healthy relationships and learning to navigate the issues that led to DCFS's involvement.

¶ 10 At the permanency hearing held on May 6, 2024, Caritas caseworker Joy Armstrong testified about the AirTag incident and explained that the agency was assisting the parents in starting up visitation again. It would have to take place in a secure location with a security guard present, and Armstrong stated that the agency was assisting the parents in transporting each of them to the location where the visits would take place.

¶ 11 Regarding Father's services, Armstrong testified that he was recommended to complete a substance abuse assessment, but to her knowledge, Father had not yet called Centerstone to set up an intake appointment. The home remained in an appropriate condition for children, but there was

4

still concern about the outside of the home, as the yard was littered with potentially dangerous items. This concern had not been alleviated by the time of the hearing.

¶ 12    Prior to the April 2024 AirTag incident, visitation had taken place in the home, and the parenting program required the ability to observe home visits. When those were suspended, Father could not proceed with the program. However, Armstrong referred Father to Centerstone to complete parenting services there instead. Armstrong testified that she was aware he had called Centerstone to set up an appointment, but he did not get through and was supposed to call back. Later that April, Centerstone informed Armstrong that he had not yet done so.

¶ 13    Armstrong also testified that Caritas was recommending adding mental health services back to Father's service plan because, in her observations and interactions, Father had been a "passive member in the case," with most of the communication going through Mother. Armstrong explained that counseling would be vital for Father to understand his role in the minors' removal. She also said that Father was present at the visitation when the AirTags and cell phone were placed on the minors.

¶ 14    Father also testified at the May 6, 2024, permanency hearing. He said that Centerstone told him to call at 8 a.m. to secure an appointment and that he would receive a callback later the same day. He testified that he tried calling as close to 8 a.m. as he could, given the fact that he worked around heavy machinery and needed to follow safety procedures. He tried calling approximately three or four times a week for two weeks, but never received a response.

¶ 15    The circuit court found that the parents placed the AirTags on the minors, and that this was an act of surveillance. The court further stated that, pursuant to its order, DCFS/Caritas did have the ability to make critical decisions regarding visitation, including suspending it. Regarding both parents' inability to continue with parenting services because of the suspended visits, the circuit

court found that this was the result of the parents' own actions, and not those of DCFS/Caritas. The circuit court further opined that both parents were making "some efforts" to correct the conditions that led to the minors' removal, but that "some of their own actions are going to prohibit their own progress in the case." The court therefore found that Mother and Father had made some efforts but not substantial progress, and that there was "still a lot of progress that needs to be made." Next, the circuit court found that Father's testimony regarding his attempts to contact Centerstone was credible, and there was no evidence presented to contradict his statements. The court said that this went towards his efforts, but that until he actually completed any tasks, there was no progress shown. While the circuit court acknowledged that Father was trying to engage in services around his work schedule, it stated that he was nevertheless required to complete the services. The circuit court entered a permanency order the same day, with its finding that Father had made reasonable efforts but not substantial progress.

¶ 16 Father was arrested out of state on August 29, 2024, and charged with possession of drug paraphernalia, receiving a stolen firearm, and possession of marijuana. According to an October 2, 2024, Caritas permanency report, Father was not recommended for substance abuse treatment following an assessment with Centerstone. However, the agency was recommending that his need for substance abuse services be re-assessed in light of the drug-related charges. The report also indicated that Mother had recently been arrested and charged with domestic battery stemming from an incident between her and Father. Because of this incident, both parents were referred to domestic violence services on August 21, 2024.

¶ 17 At a permanency hearing on October 7, 2024, the State and the guardian *ad litem* (GAL) did not argue that Father failed to make reasonable efforts. However, both recommended that the circuit court find that he had not made reasonable progress. After hearing testimony and

recommendations, the circuit court stated that, were it not for Father's arrest, the court would find that he had made reasonable efforts but not substantial progress. The circuit court noted that Father had made efforts during visitation, improved his communication with the agency, and credibly testified that he was self-employed, despite his failure to provide proof of income. However, because of the arrest, and because it related to drugs and receiving stolen property in the form of a firearm, the court found that Father had not made reasonable efforts towards bringing his children home, describing the arrest as a step backwards. The court further found that Father failed to make reasonable progress, due to the arrest and his failure to complete any tasks or services and correct the conditions that led to the minors' removal.

¶ 18    On February 14, 2025, the State filed a motion to change the permanency goal from return home within 12 months to substitute care pending termination of parental rights, alleging that Father was not involved in any services as of the most recent Caritas report filed on January 29, 2025. The circuit court granted the motion and changed the permanency goal as requested in a permanency order dated July 2, 2025. In this order, the circuit court also found that Father failed to make reasonable efforts or progress, due to his failure to complete substance abuse, domestic violence, and parenting services.

¶ 19                                  B. Fitness Hearing

¶ 20    The State filed a motion seeking a finding of parental unfitness and termination of parental rights on July 3, 2025, alleging that Father (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare; (2) failed to make reasonable efforts to correct the conditions that were the basis for the minors' removal; and (3) failed to make reasonable progress towards the return of the minors during any nine-month period following the adjudication of neglect. On August 11, 2025, the State filed a notice that the nine-month period alleged in its

7

motion was to be April 1, 2024, to December 31, 2024. The circuit court held a fitness hearing on September 22, 2025.

¶ 21    At the hearing, former Caritas foster care supervisor Breanna Benson testified that she was involved in the minors' case through her supervision of caseworker Joy Armstrong, and was involved in the case until September 13, 2024. She testified about a service plan prepared by Armstrong and approved by Benson for Father in July 2023 which had a target completion date of July 25, 2024. She stated that housing was added to Father's service plan because one of the conditions that led to the minors' removal was an unsuitable living arrangement. Father and Mother initially made some improvements to the home, and it was deemed suitable for visitation. However, both parents left the home following the June 2024 domestic violence incident that led to Mother's arrest.

¶ 22    Father also initially provided a paystub from a construction company as proof of income, but did not provide any further documentation showing a legal source of income past 2023. He was currently rated unsatisfactory on that task. Father completed a mental health evaluation and was recommended for mental health services based on the results of that evaluation. He never submitted any proof that he had engaged in any such services, and to Benson's knowledge, he never obtained mental health counseling. He was therefore rated unsatisfactory on mental health services. Regarding substance abuse services, Benson explained that Father had originally completed an assessment, but the circuit court then ordered that substance abuse services be removed from Father's service plan. However, they were added back after Father was arrested and charged with drug-related offenses in August 2024.

¶ 23    Benson also testified about the status of Father's parenting services, saying that his progress was disrupted due to the AirTag incident in April 2024. It was disrupted again after Father

left the home, and Caritas was working with him to find new housing. Father was currently rated unsatisfactory on parenting. Regarding anger management, which was on Father's original service plan, this service was later deemed unnecessary and was removed. Following the June 2024 domestic violence incident, Father was referred to a batterer's program, but he neither completed an intake evaluation nor engaged in classes during Benson's time on the case.

¶ 24 Benson also testified about a service plan dated March 8, 2024, which she also reviewed and approved. By the time that Benson left Caritas in September 2024 Father remained unsatisfactory on that service plan as well. The home still had outstanding safety and cleanliness concerns by the time Father moved out around June 2024. After that point, he did not have a stable residence and alternated between staying with his grandmother and living in his car. He was assigned a housing advocate to assist him in obtaining new housing, but his cooperation dropped off, and he was eventually unsatisfactorily discharged. He therefore remained unsatisfactory on maintaining suitable housing from March to September 2024.

¶ 25 Substance abuse services were re-added to Father's service plan in August 2024 and he was referred to complete an assessment. Benson did not have any knowledge of him doing so, although she stated that she left shortly after these services were re-added. Father was also unsatisfactory on parenting services, for the reasons Benson previously discussed. She was not aware of Father completing any other parenting classes from March to September 2024. Regarding domestic violence services, Benson testified that Father was rated unsatisfactory. He had completed an assessment but had not completed the batterers' program during her time at Caritas. Father also never provided any proof of income during this time. After the one paystub he provided in 2023, he was working as a self-employed contractor. However, he became unemployed at some

9

point around June 2024 because he could not drive to jobs due to car trouble. Benson was unsure whether he had any consistent employment from July to September 2024.

¶ 26 Benson opined that Father had not made reasonable efforts or progress from April 1, 2024, through the date she left Caritas, September 13, 2024. She added that his visitation was inconsistent due to issues with transportation and the location change in April 2024. However, she said that he made an effort to visit as often as he could, and, to her knowledge, his behavior at visits was positive. However, she did not have much firsthand knowledge of these visits.

¶ 27 On cross-examination, she explained that she did not personally write the service plans or make the service recommendations, and that her knowledge was based on service provider reports and caseworker reports. She stated that she personally reviewed the services Father was required to complete, but she did not review the service plans with Father. When asked whether she was aware of any barriers Father may have had in completing his services, she explained that there were always barriers in such cases, but some were created by the parents themselves. She also stated that the agency tried to alleviate some of Father's barriers, offering assistance like transportation, paying an electrical bill, providing him with a housing advocate, spraying for the cockroaches that were observed in the home, and helping him obtain funds to get his car back so that he could travel to jobs and visitation.

¶ 28 Benson was also asked about why the parents' home was said to have passed a safety check according to the April 2024 permanency report, but the March 2024 service plan indicated that the home was not suitable. Benson stated that the permanency report reflected a home safety check done in November 2023 and the later service plan reflected more current information.

¶ 29 Former Caritas employee Kadie Lind also testified. She said she worked at Caritas from February 2019 through May 2, 2025, and served as a supervisor for the minors' cases beginning

10

in September 2024 taking over for Benson. Lind explained that her work included reviewing court reports, service plans, and safety assessments; signing off on referrals; and grading service plans. She also received information about the case from caseworkers. The first time she met Father was in February of 2025.

¶ 30    Lind testified about Father's efforts and progress on his service plan from September 13, 2024, through December 31, 2024. She stated that he did not complete his housing requirement and was rated unsatisfactory during this time. After completing a mental health assessment, Father did not engage in the recommended counseling. He also had not completed substance abuse counseling or parenting classes. Father was unsatisfactorily discharged from the domestic violence program for failing to participate, and he had not completed domestic violence counseling. He never showed any proof of income during the relevant time.

¶ 31    Lind testified that from September 13, 2024, through December 31, 2024, Father was overall unsuccessful in completing his service plan, and she did not believe that he had made reasonable efforts or reasonable progress toward the return of the minors. Lind also testified that Father was fairly consistent in visiting the minors, but had failed to correct any of the conditions that brought them into care. On cross-examination, Lind explained that if there had been any documentation of Father's completion of any services, it would be contained in the case file. She reviewed the case file and found no such documentation. The State called no further witnesses.

¶ 32    Father testified on his own behalf that he had completed three classes of the parenting program before it was discontinued due to the AirTag incident. He also stated that he did not know whether he had been recommended for any substance abuse counseling following his second assessment, because on the date that he was supposed to return to the service provider for his next appointment, he was in the hospital after injuring his foot in an accident. He said that he could not

11

contact the office for another appointment because it was a satellite office, meaning nobody was at the office to receive his call unless someone had a pre-made appointment scheduled. On cross-examination, he said that the accident occurred in August of 2025.

¶ 33    Father testified that he completed intake for domestic violence services, but he could not complete the program because it was virtual, and he did not have regular internet access. He stated that he informed his caseworker but was not offered assistance until 2025. Regarding income, Father testified that he was self-employed doing odd jobs and his income varied.

¶ 34    On cross-examination, Father explained that when he was arrested the previous year, he was only arrested for the firearm offense, and was given citations for possession of marijuana and drug paraphernalia. Father also testified that after June 2024 he did not have a home of his own in which he actually resided. Instead, he alternated between staying with his grandmother and with a friend. When asked about the housing advocate he was provided, Father stated that he called this person, and was told that there were no available apartments. Father admitted that, from April 1, 2024, to December 31, 2024, he did not have any documentation of having completed parenting, mental health, substance abuse, or domestic violence services; he did not have his own housing; and he did not provide Caritas with any paystubs or paychecks. Father presented no further witnesses or evidence.

¶ 35    After hearing arguments, the circuit court stated that it had considered Father's counsel's contention that Benson and Lind's testimony was based on insufficient personal knowledge for the State to meet its burden of proof. In its consideration, the circuit court determined that Benson had testified to "a very active role" in case management, including reviewing tasks, rating service plans, and especially going over provider reports and information, all of which gave her adequate personal knowledge. As for Lind, she testified that any services or tasks that were completed would

12

have been documented in the case file, and she testified to her review of that case file and how it was void of any proof that Father had completed his services.

¶ 36    Regarding reasonable efforts, the circuit court considered the conditions that were the basis for the minors' removal and found that the evidence showed that Father failed to complete parenting services in the time from April 1, 2024, to December 31, 2024. He completed a mental health assessment but failed to complete any treatment. He showed initial proof of income, but his employment changed over the course of the case, and he failed to provide documentation of a legal source of income for his self-employment. There was some progress on housing as of April 2024 after the home passed a safety inspection, but Father testified that he did not return to that home or have any stable residence after approximately June of 2024, and he did not show any proof that he satisfied his housing requirements.

¶ 37    As for reasonable progress toward the return home of the minors, the circuit court found that Father had not completed the tasks outlined in his service plan by the conclusion of the relevant nine-month period. The court noted in particular that Father failed to complete substance abuse and domestic violence services—the two requirements that were added to his service plan due to specific incidents that directly related to whether the minors could safely be returned to Father's care.

¶ 38    Therefore, the circuit court found by clear and convincing evidence that the State had proven lack of reasonable efforts and progress during the nine-month period from April 1, 2024, to December 31, 2024. The court declined to find that the State had met its burden of proving that Father failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare, as the evidence showed that Father did not have the periods of noncompliance and

13

noncommunication with the agency that Mother did, and that he maintained visitation with the minors. The matter was set for a best-interest hearing.

¶ 39                                C. Best-Interest Hearing

¶ 40    DCFS and Caritas filed a best interest report on October 2, 2025, in advance of the hearing. The report indicated that Robert B. was on his seventh placement and had been in his current foster placement for approximately nine months. The caseworker observed him to have a strong bond with his foster parents, and the child reported that he "really liked" the home. The minor sometimes referred to the foster parents as "mom" and "dad," and had expressed that he felt comfortable telling them when he needs help and when he had done something wrong. He also said that the current foster family treated him nicer than any other family with whom he had lived, including his biological family. The minor was eager to tell the caseworker about various activities he did with his foster family. He was doing well in school and the foster parents helped him with his homework, enrolled him in extracurriculars, and made sure he attended counseling. They advocated for his needs, were proactive in checking for any health issues, and intended to adopt him if his parents' rights to him were terminated.

¶ 41    Berry B. was on his fifth placement and had been with his current foster family for a little over a year. He was diagnosed with autism, and his current foster parent had transformed his room to accommodate his needs and gave him many outlets for experiencing safety and comfort in his environment. While he was mostly non-verbal, he had started to refer to the foster parent as "mom." The caseworker observed a strong bond between the minor and the foster parent and described the minor as thriving in this placement. The foster parent was potty training him and monitoring his complex medical and mental health needs, including his medication and getting him tested for lead, as he came into this current placement with high levels of lead. His most recent

14

tests showed improvement, and he no longer needed testing. The caseworker described the foster parent as dedicated to the minor's safety, care, and education, and she was always willing to advocate for his needs and looking for ways to improve his quality of life. The foster parent intended to adopt him if the parents' rights to him were terminated.

¶ 42    The circuit court held a best-interest hearing on October 7, 2025. Caritas caseworker Salem Neumann testified that, based on Father's current outstanding service requirements, it would take realistically take him approximately a couple of years to complete his service plan, if he fully engaged and cooperated with the agency. Neumann said that Father consistently attended visitation, the children were happy to see him, and there were no issues with his conduct. However, he said that Father's performance on his service plan and his overall participation with the agency were not up to standard.

¶ 43    Neumann also testified to the best interest report that he prepared for the court and spoke of how both minors were doing in their respective foster placements. Both minors were thriving and were closely bonded with their foster families. The foster parents were loving and supportive and met each child's needs. Both were willing to adopt the minors.

¶ 44    The circuit court found that the minors had been moved around several times during the case, and both were experiencing stability in their current placements. The court further found that Father and Mother were not currently at a place where they had corrected the conditions that brought the minors into care, and very important tasks remained outstanding. The circuit court reviewed the statutory best interest factors and determined that the evidence supported a finding that termination of Father and Mother's parental rights was in the best interest of the minors.

¶ 45    On October 7, 2025, following the best-interest hearing, the circuit court entered a judgment terminating both parents' parental rights over the minors. This appeal followed.

15

II. ANALYSIS

¶ 47    On appeal, Father argues that the circuit court's findings that he was an unfit parent for

failing to make reasonable efforts and reasonable progress were against the manifest weight of the

evidence. He further argues that he received ineffective assistance of counsel. We reject both

contentions. Additionally, Father does not challenge the circuit court's best-interest finding. We

therefore need not review it here. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (points not argued

are forfeited).

¶ 48                    A. The Circuit Court's Finding of Unfitness

¶ 49    A parent's right to raise his or her child is a fundamental right, which a court may not

terminate without the parent's consent except as authorized by statute. *In re Gwynne P.*, 215 Ill.

2d 340, 354 (2005). A court's statutory authority to involuntarily terminate parental rights is

governed by the Juvenile Court Act and the Adoption Act. *In re Gwynne P.*, 215 Ill. 2d at 354; 750

ILCS 50/0.01 *et seq.* (West 2024). Pursuant to the Juvenile Court Act, the involuntary termination

of parental rights requires a two-step process. *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). First,

the court must determine, by clear and convincing evidence, that the parent is an "unfit person" as

defined by section 1(D) of the Adoption Act. *In re Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS

405/2-29(2) (West 2024); 750 ILCS 50/1(D) (West 2024). If the court makes a finding of unfitness,

it next considers whether termination of the parent's rights is in the best interests of the child. *In re*

*Donald A.G.*, 221 Ill. 2d at 244; 705 ILCS 405/2-29(2) (West 2024).

¶ 50    As applicable to the underlying case, the Adoption Act defines an "unfit person" as:

> D. "Unfit person" means any person whom the court shall find to be unfit to have a
> child, without regard to the likelihood that the child will be placed for adoption. The
> grounds of unfitness are any one or more of the following ***:
> * * *
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that
> were the basis for the removal of the child from the parent during any 9-month period

following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor ***." 750 ILCS 50/1(D)(m)(i), (ii) (West 2024).

¶ 51    Under the Adoption Act, "reasonable effort" is "a subjective standard and refers to the amount of effort reasonable for the particular parent." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34. The court must determine "whether the parent has made earnest and conscientious strides toward correcting the conditions that led to the removal of the minor from the home." *In re P.S.*, 2021 IL App (5th) 210027, ¶ 34.

¶ 52    "Reasonable progress," by contrast, is determined by an objective standard, which is based upon the amount of progress measured from the conditions existing at the time custody was revoked. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47. The Adoption Act provides guidance for measuring reasonable progress as follows:

> "If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan ***." 750 ILCS 50/1(D)(m)(ii) (West 2024);

Under section 1(D)(m) of the Adoption Act, the benchmark for measuring reasonable progress "encompasses the parent's compliance with the service plans and court's directives in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from returning custody of the child to the parent." *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)).

¶ 53    In reviewing a court's findings that a parent is unfit and that terminating parental rights is in the best interest of the child, we do not retry the case; rather, we must determine if the findings are against the manifest weight of the evidence. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. The

17

lower court's finding of unfitness is afforded great deference because that court was best positioned to view and evaluate the parties and their testimony. *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. Accordingly, on appeal, we will not reweigh the evidence or reassess the credibility of the witnesses. *In re* Za. *G.*, 2023 IL App (5th) 220793, ¶ 31. A decision is contrary to the manifest weight of the evidence "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re* Za. *G.*, 2023 IL App (5th) 220793, ¶ 31.

¶ 54 Here, the circuit court found that Father failed to make either reasonable efforts or reasonable progress. Father challenges these findings on multiple bases. Regarding reasonable efforts, Father first argues that the circuit court found that he made reasonable efforts in its May 6, 2024, permanency order during the relevant nine-month period, a finding based in part on the court's belief that Father's testimony was credible regarding his attempt to contact Centerstone for parenting and substance abuse services. Father adds that the circuit court then changed its finding at the October 7, 2024, permanency hearing, where the court stated that it would have found reasonable efforts, but for Father's recent arrest. Father now contends that there was no evidence that this arrest interfered with his efforts to complete services and correct conditions. Father further argues that the circuit court improperly faulted him for leaving the home after being the victim of Mother's domestic violence and wrongly measured his efforts by whether he completed services.

¶ 55 Regarding the circuit court's reasonable progress finding, Father argues that the court erred in believing that the completion of services was required in order for progress to be reasonable. He also contends that the circuit court failed to acknowledge the progress he did make, which he lists as (1) three sessions of a parenting program, before it was cancelled due to the suspension of in-home visitation; (2) a substance abuse assessment; (3) an intake for the domestic violence

18

program; (4) interaction with a housing advocate; and (5) "maintain[ing] employment at least part of the time." Father further argues that two of the Caritas witnesses who testified on both Father's progress and efforts—Kadie Lind and Salem Neumann—did not have personal knowledge during the relevant nine-month period, and relied only on reviews of Caritas records.

¶ 56    Father also argues that the circuit court failed to consider that Caritas impeded him in making reasonable efforts or progress through delays and unresponsiveness in referring him to services. As examples,[4] he lists (1) the cancelled visitation and parenting program, where the evidence presented showed that Mother was the only one who placed AirTags on the minors, thus preventing Father from completing his parenting service requirement; (2) the circuit court's finding that Father's testimony was credible regarding the six to eight failed attempts he made to contact Centerstone about starting a new parenting program; (3) Father's testimony that he had the same difficulties reaching Centerstone to begin substance abuse services, and Neumann's testimony at the July 2, 2025, permanency hearing that a new referral to a different provider was not made until May or June of 2025; (4) the circuit court struck mental health services from Father's service plan on March 6, 2024, but Caritas added them back shortly after; (5) Armstrong's testimony during the March 6, 2024, dispositional hearing that Father showed proof of income, and Father's testimony at the fitness hearing that he had shown her proof of income on several occasions; (6) Armstrong's and Father's testimony about his difficulty in reaching the housing advocate and Neumann's testimony at the July 2, 2025, permanency hearing that Father was not given an alternate referral until May 2025; and (7) the fact that Father was referred to a batterer's program for domestic violence services, when he was the victim of domestic violence perpetrated

[4]Father also includes examples that occurred outside of the relevant nine-month period. While we do not list those individually, we find these irrelevant to the circuit court's findings regarding Father's efforts and progress from April 1, 2024, to December 31, 2024.

19

by Mother, as well as Armstrong's acknowledgement that he had completed the intake and was waiting to hear back from the provider to start the program. Father also cites to *In re Deerwester*, 131 Ill. App. 2d 952 (1971), in which the Fourth District held that the State failed to prove that the respondent mother failed to maintain a reasonable degree of interest as to her child's welfare where the evidence showed that she had frequently called about visiting him, met with caseworkers about him, and sent him cards on holidays and birthdays, but was unable to contact any caseworkers who would assisted her in arranging visitation. *In re Deerwester*, 131 Ill. App. 2d at 954-55.

¶ 57   Firstly, we acknowledge that evidence was presented at various points in the proceedings that Father was making reasonable efforts, and, in fact, prior to filing its termination petition, the State did not always argue that he failed to make reasonable efforts. Indeed, the circuit court recognized that Father completed multiple intakes and assessments, and was rated fairly well on visitation throughout the case. The circuit court based its finding of failure to make reasonable efforts primarily on Father's drug-related criminal charges in August 2024. The court determined that, despite prior evidence that Father was making efforts, the arrest was a "step backwards," undoing some of that effort by raising additional concerns regarding his ability to provide a safe environment for his children.

¶ 58   Similarly, the circuit court found Father's involvement in a domestic violence incident with Mother, followed by his leaving the home in June 2024 and failing to obtain suitable housing, to detract from his efforts and derail his progress. This was particularly important, as the conditions of the home environment and the presence of physical violence in the home were the primary factors in the minors' removal. However, even if we were to find that the circuit court erred in basing its unfitness determination on a lack of reasonable effort, we may affirm its unfitness finding on lack of reasonable progress alone. See *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064

(2006) ("A finding of unfitness will stand if supported by any one of the statutory grounds set forth in section 1(D) of the Adoption Act.")

¶ 59    Furthermore, while we recognize that the circuit court found Father's testimony about the various obstacles he faced attempting to contact providers in order to engage in services to be credible, we do not find Father's comparison to *In re Deerwester* persuasive. Every parental unfitness case "is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." *In re Daphnie E.*, 368 Ill. App. 3d at 1064. Here, there was plenty of uncontroverted evidence that Father failed to complete any services, and the unresponsiveness of certain providers was far from the sole, or even the primary, cause.

¶ 60    We also note that the circuit court considered and rejected the same argument that Father now raises on appeal regarding Caritas witnesses who testified not based on their personal experience in making recommendations and writing service plans and reports, but based on their supervisory roles. The circuit court heard testimony about the level of familiarity the Caritas supervisors had with Father's entire case file, their role in reviewing service plans, and their discussions with caseworkers. The circuit court found that Benson and Lind played an active role in Father's case and had sufficient knowledge to testify about his efforts and progress.

¶ 61    Furthermore, between the two of them, Benson and Lind covered the entire relevant nine-month period. As for Neumann, he did not testify at the fitness hearing. To the extent that the circuit court took judicial notice of his permanency hearing testimony or considered reports that he wrote or assisted in writing, we adopt the same reasoning. Finally, the circuit court's consideration of any Caritas witness's level of involvement in Father's case, when that involvement occurred, and what sources his or her testimony relied on all fall within the circuit

21

court's discretion to make determinations regarding witness credibility and the weight to afford their testimony.

¶ 62    Turning specifically to Father's progress on his service plan, we begin by rejecting Father's argument that the circuit court erred in looking at whether he completed any of his services. While we recognize that, by definition, it is possible to make progress without full completion, we also find that it was proper for the circuit court to consider whether Father completed any services by December 31, 2024, which was approximately a year and a half since his original service plan. See 750 ILCS 50/1(D)(m)(ii) (West 2024) (Failure to make reasonable progress "includes the parent's failure to substantially fulfill his or her obligations under the service plan.") However, the measure of reasonableness is not whether a parent made *any* progress whatsoever. Moreover, the evidence showed that Father not only failed to make it past the initial steps of multiple services, but that he even regressed on substance abuse and housing services. Reasonable progress requires, at a minimum, "measurable or demonstrable movement toward the goal of reunification." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. Movement *away* from reunification logically falls below that minimum.

¶ 63    Furthermore, the circuit court did not err in looking at the conditions that arose after removal and would prevent the return of the minors, including the AirTag incident, Father's arrest and citations, the domestic violence incident, and Father's decision to leave the home, all of which occurred during the relevant nine-month period. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 17 (holding that the benchmark for measuring reasonable progress includes the parent's compliance with service plans and court directives "in light of the condition that gave rise to the removal of the child and other conditions which later become known that would prevent the court from

22

returning custody of the child to the parent."). It therefore cannot be said that the circuit court was looking for full completion of the service plan.

¶ 64 Regarding Father's failure to make reasonable progress on substance abuse, we disagree with his assertion that there was no evidence that his arrest and citations for marijuana-related offenses interfered with his efforts to complete his services. Despite Father's original substance abuse assessment not resulting in any recommendations for further counseling or treatment, the need for substance abuse services became apparent after the August 2024 incident. The circuit court properly considered Father's efforts and progress in light of not only the conditions that originally brought the minors into care, but, as we previously stated, relevant conditions that arose after removal.

¶ 65 On housing, Father misconstrues the circuit court's findings in alleging that the court blamed him for being the victim of domestic violence. Rather, the circuit court objectively measured the progress he made toward maintaining stable, suitable housing. See *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 47 (reasonable progress is determined by an objective standard). By such measure, it was clear that Father did not maintain suitable housing during the relevant nine-month period, as he chose to leave the home and was effectively homeless for the majority of this time. Additionally, under the objective standard, a parent's personal circumstances that impede his ability to make reasonable progress are irrelevant. See *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 73; *In re F.P.*, 2014 IL App (4th) 140360, ¶ 89. Therefore, Father's contentions regarding who was the victim or perpetrator of the domestic violence are misplaced.

¶ 66 Similarly, Father's circumstances relating to his self-employment and/or working as a contractor do not excuse his failure to show any proof of legal income during the relevant time period. The record shows that Father submitted one paycheck in 2023, but nothing after. According

23

to his testimony, he was self-employed and/or a contractor, and took odd jobs during most of 2024, with caseworker testimony suggesting that he may have been unemployed for part of that time. The circuit court found Father's testimony about the work he did to be credible. However, his testimony did not satisfy the income requirement on his safety plan, and the circuit court needed some evidence of measurable, demonstrable progress on this task to be assured that Father earned enough to provide for the minors' needs. See *In re Daphnie E.*, 368 Ill. App. 3d at 1067. As Father did not submit any such evidence, the circuit court did not err in weighing it against him to make its reasonable progress findings.

¶ 67 Father's overall complaint that Caritas threw up obstacle after obstacle to prevent him from progressing on his service plan is not supported by the record. While the circuit court acknowledged times when he did have difficulty arranging services through no fault of his own—such as his efforts to reach Centerstone for parenting and substance abuse services—many of Father's obstacles were attributable to him. He was present during the home visit when Mother placed the AirTags on the minors, causing the parents to lose access to their parenting program and putting him in the position to have to contact Centerstone in the first place. His drug-related criminal charges led to having substance abuse services re-added to his plan. His decision to leave the home in June 2024 and not have a stable residence resulted in his unsatisfactory rating on his housing requirement. Conversely, the circuit court heard testimony from the State's witnesses about the various ways that Caritas attempted to assist Father in completing his services, including transportation assistance for work and connecting him with a housing advocate. Considering the record on appeal, the circuit court's determination that Father bore the primary responsibility for his lack of reasonable progress was not against the manifest weight of the evidence.

24

¶ 68     Reasonable progress exists "when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d at 1067. The record on appeal supports the circuit court's determination that Father was far from ready to have the minors returned to his care. We reiterate that the circuit court has significant discretion in making its unfitness finding, and we will only disturb its decision on "if the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence presented." *In re Za. G.*, 2023 IL App (5th) 220793, ¶ 31. That is simply not the case here. Thus, we conclude that the circuit court's decision to terminate Father's parental rights over the minors was not against the manifest weight of the evidence.

¶ 69                    B. Ineffective Assistance of Counsel

¶ 70     Parents have a statutory right to the effective assistance of counsel in termination proceedings. *In re Br. M.*, 2021 IL 125969, ¶ 42. Although the source of the right to counsel is statutory, we evaluate such claims under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). Under this standard, the parent must demonstrate (1) that counsel's performance fell below an objective standard of competence and (2) that the deficient performance prejudiced the parent. *In re Br. M.*, 2021 IL 125969, ¶ 43.

¶ 71     In conducting our review, we may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong without addressing counsel's performance. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 93. To show prejudice, the parent must prove a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *In re M.D.*, 2022 IL App (4th) 210288, ¶ 92. Additionally, she must "overcome the strong presumption that the challenged action or inaction may have been the product of sound trial

25

strategy," as "[m]atters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000).

¶ 72    On appeal, Father argues that he was denied effective assistance of counsel at the January 17, 2024, adjudication hearing, when his attorney failed to request an expert to testify as to the mental health of Mother's older daughter,[5] who testified at that hearing against Father. He adds that, on December 19, 2023, Mother's attorney asked the circuit court to appoint an expert to testify on her daughter's credibility. The circuit court stated that it was too late to request an expert. Father further asserts that his attorney was on the case for some months prior to that date, and that counsel's failure to request an expert prejudiced Father because the injurious environment and abuse allegations were premised mostly on the girl's testimony.

¶ 73    Father additionally argues that he received ineffective assistance of counsel when his attorney failed to object to the addition of domestic violence and substance abuse services to Father's service plan. Regarding substance abuse, this was added following his citation for marijuana, but Father alleges that DCFS / Caritas were aware that he consumed marijuana from the outset of the case and did not originally recommend substance abuse services. Regarding domestic violence services, Father again raises the argument that it was improper for Caritas to require him to complete a batterer's program, when the uncontroverted evidence showed that he was the victim, and not the perpetrator, of domestic violence. Father concludes that the addition of both services prejudiced him because the circuit court's unfitness finding was based in part on his failure to complete either one.

---

[5]This is the third child who was removed from Mother and Father's home following the incident that gave rise to this case. As we previously stated, Father is not her biological father, and was not named as a respondent in her case.

¶ 74    We turn first to Father's argument regarding counsel's failure to request an expert to challenge Mother's daughter's testimony at the adjudicatory hearing, leading to the circuit court's findings of neglect. This is, effectively, a challenge to the circuit court's adjudicatory and dispositional orders of January 17, 2024, and March 6, 2024, respectively. The State argues in response that the time to allege an error at this stage has long passed, and Father has forfeited this argument. We agree.

¶ 75    An order adjudicating a minor to be abused or neglected may be appealed from directly, with the court's permission, as an interlocutory order affecting the care and custody of an unemancipated minor. Ill. S. Ct. R. 306(a)(5) (eff. Oct. 1, 2020); *In re Leona W.*, 228 Ill. 2d 439, 455-56 (2008). Such an order may also be challenged through an appeal of the subsequent dispositional order, which is a final order. *In re Leona W.*, 228 Ill. 2d at 456-57. Appeals from final judgments in proceedings under the Juvenile Court Act are governed by the same rules applicable in civil cases, and thus require that the notice of appeal be filed within 30 days after entry of the judgment or after entry of the order disposing of any posttrial motions, if any were filed. *In re Leona W.*, 228 Ill. 2d at 456-57; Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). We therefore lack jurisdiction to consider Father's first ineffective assistance of counsel claim.

¶ 76    As for counsel's failure to object to Father's substance abuse and domestic violence services, we note that counsel cannot be found ineffective for failing to make a meritless objection. See *In re Charles W.*, 2014 IL App (1st) 131281, ¶ 42 (finding that counsel was not ineffective for failing to object to the admissibility of testimony that fell within the hearsay exception); see also *People v. Bell*, 2021 IL App (1st) 190366, ¶¶ 88-89 (finding counsel's failure to object to victim's testimony about the long-term effects she suffered to be reasonable in light of the trial strategy not to deny the facts of the shooting).

¶ 77    Contrary to Father's framing of the timeline, a substance abuse assessment was part of his original service plan in 2023. According to DCFS, in the first service plan filed with the circuit court, family and friends of Father and Mother reported that both parents had been observed to be intoxicated while caring for their children. This requirement was later removed after Father completed an assessment and was not recommended for any further services. As we discussed in the previous section, Caritas added another substance abuse assessment to Father's service plan due to his arrest and marijuana-related citations in August 2024. The record shows that the circuit court considered the incident to have a meaningful negative impact on Father's progress, describing it as a "step backwards" for him. Because there was already concern about Father's substance use at the start of the case, and he later incurred drug-related criminal charges, it was reasonable for counsel not to devote time and effort to challenging Father's substance abuse requirement when it was more than likely that the circuit court would reject a request to prevent Caritas from requiring Father to undergo a second substance abuse assessment.

¶ 78    Even more than substance abuse, violence in the home was an underlying cause of the minors' removal. DCFS's original service plan indicates that while Mother was the primary perpetrator of the violence, Father was present in the home when it occurred, and did nothing to protect the children. Furthermore, the service plan included domestic violence perpetrator counseling, to "assist [Father] in understanding and avoiding domestically abusive relationships." DCFS/Caritas also had concerns throughout the case about Father's relationship with Mother. The June 2024 domestic violence incident directly impacted Father's progress in correcting the conditions that were the basis for removal. Father argues on appeal that Caritas never referred him to a program for victims of domestic violence, but he does not allege that any such program was

available, or how completing such a program would have helped him correct the conditions that gave rise to this case in a way that the program chosen by Caritas could not.

¶ 79 As with substance abuse, we find that it was not ineffective assistance for Father's attorney to refrain from contesting tasks that were reasonably added to Father's service plan. Furthermore, Father failed to complete several other services beyond either domestic violence or substance abuse counseling, and therefore does not show that the circuit court would have found him fit to parent the minors without the addition of these service plan requirements. Thus, we decline to find that Father received ineffective assistance of counsel.

¶ 80                                    III. CONCLUSION

¶ 81 For the reasons stated, the circuit court did not err in terminating respondent's parental rights to the minor. The judgment of the circuit court is affirmed.


¶ 82 Affirmed.